655 A.2d 576

COMMONWEALTH of Pennsylvania

v.

Stephen BUKSA, Jr., Appellant.

Superior Court of Pennsylvania.

Submitted Dec. 12, 1994.

Filed March 7, 1995.

306

Theodore J. Krol, Asst. Public Defender, Hollidaysburg, for appellant.

Christian A. Fisanick, Asst. Dist. Atty., Barnesboro, for Com.

Before WIEAND, HUDOCK and HESTER, JJ.

WIEAND, Judge:

Stephen Buksa, Jr. was tried by jury and was found guilty of making terroristic threats, recklessly endangering another person and two counts of aggravated assault. Post-trial motions were filed, after which Buksa retained new counsel, who filed supplemental post-trial motions claiming ineffective assistance by trial counsel. Following an evidentiary hearing, the trial court denied post-trial relief. Buksa was sentenced to serve concurrent terms of imprisonment for not less than six (6) years nor more than twelve (12) years on the first count of aggravated assault and not less than one (1) year nor more

than five (5) years for making terroristic threats.[1] On direct appeal from the judgment of sentence,[2] Buksa argues that (1) the trial court erred by allowing testimony that he told his alleged victim that he had done "time"; (2) the trial court erred by refusing to allow the defense to explore the potential motive or bias of the victim by cross-examining him about his being on probation as a result of having been convicted of a drug offense; (3) trial counsel provided constitutionally ineffective assistance by failing to request that the jury be charged on the defense of justification/self-defense; and (4) trial counsel were ineffective for failing to explore additional avenues of defense.

The evidence which led to appellant's convictions was summarized in the post-trial opinion of the trial court in the following manner:

On December 30, 1992, at approximately 1:00 a.m., the victim, David Pejack, left Sebastian's Tavern in Johnstown and began walking toward The Depot Lounge in the West End. As the victim was walking on Franklin Street, he was approached by a vehicle driven by the Defendant. The victim entered the Defendant's vehicle. The two men made one stop at Charlotte's Webb Bar on Ash Street in Johnstown. The victim entered the bar and returned to the Defendant's vehicle with two cans of beer. It is at this point that the victim's version and the Defendant's version of what happened diverge.

The victim testified at trial that the Defendant stopped his vehicle and offered him a ride to wherever he was going. After stopping for beer, the victim told the Defendant he wanted to go to Benshoff Hill. On the way there, Defendant said he had to take a p[iss] and headed off the main road onto a dark, bumpy road in a wooded area.

---

1. Sentence was suspended on Buksa's convictions for the second count of aggravated assault and for recklessly endangering another person.

2. The amended notice of appeal in this case incorrectly identifies this appeal as being from the order of the trial court which denied post-trial relief. However, because Buksa initially filed his appeal within thirty days of the imposition of the judgment of sentence, we will treat the appeal as having been properly taken from the judgment of sentence.

The victim testified that the Defendant stopped the car and got out for approximately 30–60 seconds. The Defendant then re-entered the vehicle, put his arm around the victim's neck, held a knife to the victim's throat, and said "I did eight years in Western, now pull them pants down."

The victim stated that he pulled his pants and underwear down to his upper thigh area and the Defendant then touched his genitals. At this point the victim opened the passenger side door and fell to the ground outside.

A scuffle took place outside of the car between the two men. The victim stated that he stuck his right thumb in the Defendant's eye to block the knife which the Defendant was aiming at his head. Regardless, the knife cut the victim's head twice.

The victim testified that the Defendant then pulled away, closed the knife, and gave him a rag with snow on it to press against his stab wound. The Defendant stated he would not hurt the victim. Reluctantly, the victim got back in the Defendant's car and was driven by the Defendant to the emergency room at Lee Hospital.

At the time of trial, the Defendant's version of what happened was different than the victim's version. The Defendant took the stand in his own behalf and testified that when he saw the victim on Franklin Street, the victim motioned for him to stop his car. When the Defendant stopped, the victim asked the Defendant if he knew whether there was anyplace open to buy beer. The Defendant testified that he offered the victim a ride. The Defendant drove to Charlotte's Webb Bar and waited in the car while the victim went inside to buy beer. After stopping for beer, the Defendant said he would drive around until the victim finished his beer and then he would drop the victim off in the eighth ward.

The Defendant testified that they had a problem with the cassette player in his car as they headed up Dishong Mountain. As a result of the fog and poor visibility, the Defendant testified that he had to pull over and stop the

vehicle in order to get the tape out of the cassette player. The Defendant further stated that as he was leaning toward the cassette player in the middle of the vehicle, he looked over at the victim and noticed that he was holding a knife. The Defendant testified that the victim demanded his money, at which point the Defendant reached in his wallet and handed the victim all the money he had, totalling eleven dollars. The Defendant said the victim got furious due to the small amount of money given to him and kept demanding more money from the Defendant. According to the Defendant, the victim then moved toward him with the knife so the Defendant grabbed the victim's right hand which was holding the knife. At this point, the Defendant said the victim started to back toward the passenger side door. The Defendant testified that he followed the victim over the console and passenger side seat and continued following him the whole way out of the passenger side door because he couldn't take the chance of letting go of the knife.

Once outside of the car, the Defendant stated that he slipped and fell on his right shoulder. The Defendant testified that the victim fell to the ground as well and dropped the knife. The Defendant said he was able to recover the knife. It was the Defendant's testimony at trial that the victim then stuck his thumb in the Defendant's eye. Consequently, the Defendant said he raised his hands in the air and accidentally cut the victim because he was holding the knife in one hand.

The Defendant stated that he was then able to subdue the situation as he had the victim on the ground on his back. At this point the Defendant testified that he was no longer in fear of being injured so he threw the knife aside. The Defendant stated he got the victim a rag to apply to his wound and drove the victim straight to the hospital.

The jury chose to believe the victim's version of the events that took place on December 30, 1992, finding the Defendant guilty beyond a reasonable doubt of terroristic

threats, recklessly endangering another person, and two counts of aggravated assault.

Trial Court Opinion at pp. 3–7.

■ Appellant contends that the trial court erred by allowing the victim to testify that, during the assault, appellant said, "I did eight years in Western, now pull them pants down." It is argued that this testimony impermissibly referred to a prior criminal record. We disagree. This testimony was admissible because it was about a statement made by the appellant to threaten and intimidate his victim. Evidence of distinct crimes is admissible in "situations where defendant's prior criminal history [was] used by him to threaten or intimidate the victim." *Commonwealth v. Billa,* 521 Pa. 168, 177, 555 A.2d 835, 840 (1989). See also: *Commonwealth v. Claypool,* 508 Pa. 198, 495 A.2d 176 (1985).[3]

■ Prior to trial, the Commonwealth had filed a motion in limine to prevent the defense from showing that the alleged victim was on probation for a drug offense. At the conclusion of a pre-trial hearing on the motion, the trial court ruled as follows:

> As to the request of the defendant to be able to bring out that Mr. Pejack is on probation now and was on probation at that time therefore it would tend to in some way cause him to fabricate a statement, I'm going to deny that because the defendant was on probation at the same time. And I'm not going to allow it in for either one.

N.T. May 7, 1993, at p. 5. Appellant argues on appeal that this was error. Because the Commonwealth's witness was on probation, he argues, the jury was entitled to know that he had a motive for giving testimony favorable to the Commonwealth and adverse to the defendant. There is merit in this argument.

---

**3.** At the conclusion of the victim's testimony on direct examination, the trial court cautioned the jury as to the limited purpose for which appellant's statement to the victim was to be considered. A similar cautionary instruction was included in the court's final charge to the jury.

■ "The scope and limits of cross-examination are largely within the discretion of the trial court and its actions pertaining thereto will not be reversed in the absence of a clear abuse of its discretion or error of law." *Commonwealth v. Buehl,* 510 Pa. 363, 388, 508 A.2d 1167, 1179 (1986), *cert. denied,* 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988). See also: *Commonwealth v. Wilson,* 538 Pa. 485, 505, 649 A.2d 435, 445 (1994); *Commonwealth v. Snoke,* 525 Pa. 295, 305, 580 A.2d 295, 300 (1990). Nevertheless, "[c]riminal defendants have a constitutional right to confront witnesses against them, which includes the right to cross-examine. Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish the witness' motive for testifying." *Commonwealth v. Robinson,* 507 Pa. 522, 526, 491 A.2d 107, 109 (1985), citing *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) and *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). It is well established "that a witness may be cross-examined as to any matter tending to show the interest or bias of that witness." *Commonwealth v. Nolen,* 535 Pa. 77, 83, 634 A.2d 192, 195 (1993) (footnote omitted). See also: *Commonwealth v. Butler,* 529 Pa. 7, 14, 601 A.2d 268, 271 (1991); *Commonwealth v. Williams,* 524 Pa. 218, 228, 570 A.2d 75, 80 (1990); *Commonwealth v. Coades,* 454 Pa. 448, 452–453, 311 A.2d 896, 898 (1973). "It is particularly important that, where the determination of a defendant's guilt or innocence is dependent upon the credibility of a prosecution witness, an adequate opportunity be afforded to demonstrate through cross-examination that the witness is biased." *Commonwealth v. Birch,* 532 Pa. 563, 566, 616 A.2d 977, 978 (1992). See also: *Commonwealth v. Lane,* 533 Pa. 276, 279–280, 621 A.2d 566, 568 (1993); *Commonwealth v. Reed,* 435 Pa.Super. 36, 44–48, 644 A.2d 1223, 1227–1228 (1994) (plurality opinion).

Thus, in *Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626 (1986), the Pennsylvania Supreme Court declared:

[W]henever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness,

must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

The jury may choose to believe the witness even after it learns of actual promises made or possible promises of leniency which may be made in the future, but the defendant, under the right guaranteed in the Pennsylvania Constitution to confront witnesses against him, must have the opportunity at least to raise a doubt in the mind of the jury as to whether the prosecution witness is biased. It is not for the court to determine whether the cross-examination for bias would affect the jury's determination of the case.

*Id.* at 224–225, 512 A.2d at 631–632 (footnote omitted). See also: *Commonwealth v. Gentile,* 433 Pa.Super. 381, 387–389, 640 A.2d 1309, 1313–1314 (1994); *Commonwealth v. Rhodes,* 405 Pa.Super. 570, 573–575, 592 A.2d 1360, 1361–1362 (1991). Similarly, the Superior Court has observed:

As a general rule, defense counsel must be permitted to cross-examine a Commonwealth witness on possible favorable treatment or expectations of such favorable treatment in exchange for testimony for the prosecution. Failure to allow cross-examination to reveal possible bias of this nature is error and will require a new trial unless the error can be shown to have had no impact on the outcome of the case. *See Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626 (1986); *Commonwealth v. Jennings,* 405 Pa.Super. 590, 592 A.2d 1370 (1991); *Commonwealth v. Blassingale,* 391 Pa.Super. 395, 571 A.2d 426 (1990). The principle upon which this rule is premised is that the jury should have the opportunity to consider information concerning possible ulterior motives on the part of the witness in order accurately to assess the witness' credibility.

*Commonwealth v. Culmer,* 413 Pa.Super. 203, 212, 604 A.2d 1090, 1094–1095 (1992). See also: *Commonwealth v. Battiato,* 422 Pa.Super. 285, 296–297, 619 A.2d 359, 364–365 (1993).

In its post-trial opinion, the trial court asserted that cross-examination of the victim regarding his probationary status would not have been permissible under the general rule established in *Commonwealth v. Evans, supra* 511 Pa. 214, 512 A.2d 626. This is so, the trial court concluded, because, once the victim had been sentenced to a term of probation, there was a final disposition of his prior drug conviction; and, therefore, the victim no longer had any motive to testify favorably for the prosecution, as the Commonwealth no longer exercised any control over the victim's sentence. As we shall see, however, the trial court's reasoning in this regard was flawed.

An order placing a criminal defendant on probation does not constitute a final disposition of a criminal case against him. "It is rather an interlocutory judgment, in the nature of a conditional order placing the defendant under the supervision and control of the court, in a system of tutelage designed for his reformation, to be followed by a final judgment of discharge, if the conditions of his probation are complied with, or by a final judgment of sentence on his being brought before the court following a violation of the terms of his probation. . . ." *Commonwealth ex rel. Paige v. Smith,* 130 Pa.Super. 536, 543, 198 A. 812, 815 (1938) (citations omitted). See: *Commonwealth v. Nicely,* 536 Pa. 144, 150–152, 638 A.2d 213, 216–217 (1994). "Probation is a suspended sentence of incarceration served upon such terms and conditions as imposed by the sentencing court." *Fleegle v. Commonwealth, Board of Probation and Parole,* 110 Pa.Commw. 227, 230, 532 A.2d 898, 899 (1987). "[T]he basic objective of probation is to provide a means to achieve rehabilitation without resorting to incarceration. When it becomes apparent that the probationary order is not serving this desired end the court's discretion to impose a more appropriate sanction should not be fettered." *Commonwealth v. Kates,* 452 Pa. 102, 115, 305 A.2d 701, 708 (1973). As such, a "court may revoke an order of probation upon proof of the violation of specified conditions of the probation." *Commonwealth v. Perry,* 342 Pa.Super. 355, 356, 492 A.2d 1158, 1159 (1985). See also: *Commonwealth v. Pierce,* 497 Pa. 437, 440, 441 A.2d 1218, 1219 (1982). "Upon revocation of

probation, the trial court possesses the same sentencing alternatives which were available at the time of the initial sentencing." *Commonwealth v. Anderson,* 434 Pa.Super. 309, 317, 643 A.2d 109, 113 (1994). See also: *Commonwealth v. Miller,* 358 Pa.Super. 219, 224, 516 A.2d 1263, 1266 (1986).

■ Because it is clear that an order of probation constitutes a non-final disposition of a criminal case, a defendant must be permitted to cross-examine a Commonwealth witness regarding the witness's probationary status under the rule of *Commonwealth v. Evans, supra* 511 Pa. 214, 512 A.2d 626, to explore motive and potential bias of the witness. In this regard, the Pennsylvania Supreme Court has declared "that 'the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as a juvenile delinquent.' " *Commonwealth v. Murphy,* 527 Pa. 309, 311, 591 A.2d·278, 279 (1991), quoting *Davis v. Alaska,* 415 U.S. 308, 309, 94 S.Ct. 1105, 1107, 39 L.Ed.2d 347, 349 (1974). See: *Commonwealth v. Case,* 322 Pa.Super. 24, 31, 469 A.2d 162, 165 (1983) ("The logical connection between the fact that the witness was on probation, and the inference to be drawn, that the witness might be biased toward the state, is clear and direct."). See also: *Commonwealth v. Walker,* 384 Pa.Super. 562, 566–568, 559 A.2d 579, 581–582 (1989) (plurality opinion); *Commonwealth v. Cauto,* 369 Pa.Super. 381, 387–388, 535 A.2d 602, 605–606 (1987); *Commonwealth v. Gay,* 369 Pa.Super. 340, 342–345, 535 A.2d 189, 190–191 (1988). Cf. *Commonwealth v. Ocasio,* 394 Pa.Super. 100, 103–104, 574 A.2d 1165, 1167–1168 (1990) (trial court committed reversible error by refusing to allow defendant to cross-examine Commonwealth witness as to possible bias resulting from witness's admission into ARD).

In *Commonwealth v. Simmon,* 521 Pa. 218, 555 A.2d 860 (1989), the Supreme Court explicitly held "that a prosecution witness's juvenile probationary status is relevant to show bias regardless of whether the person appears as the victim/complainant." *Id.* at 224, 555 A.2d at 863 (footnote omitted). In so holding, the Court observed:

The Commonwealth's assertion that Hood was the victim of the assault and therefore her probationary status was not endangered merely states a conclusion. Such inverted logic denies the reality of the vulnerable status of a probationer. The threat of revocation, no matter how subtle, based on a violation of a probation condition (i.e. not engaging in assaultive behavior) always can be used by the prosecution to ensure cooperation. Indeed, it might precede the prosecutor's involvement by providing the motivation for the complainant to report that she had been assaulted. Were Hood the aggressor and Simmon the victim, assuming she were on probation, it would benefit Hood to report her wound as though she were the victim, thus deflecting any inquiry that might jeopardize her probation.

*Commonwealth v. Simmon, supra* at 224 n. 4, 555 A.2d at 863 n. 4.

The same rationale is controlling in the instant case.[4] Here, appellant claimed that the victim had been the aggressor in an attempt to rob him. It was relevant, therefore, for appellant to show the victim's probationary status and argue that it provided a potential motive for the victim to lie about appellant's being the aggressor. We conclude, therefore, that the trial court erred by refusing to permit appellant's cross-examination of the victim regarding his being on probation.

 With respect to appellant's claims of ineffective assistance by his trial counsel, the Superior Court has stated the applicable law in the following manner:

"Because the law presumes that counsel is effective, the burden of establishing ineffectiveness rests with appellant." *Commonwealth v. House,* 371 Pa.Super. 23, 28, 537 A.2d 361, 363 (1988). The standard used to evaluate claims of ineffective assistance of counsel has been stated by the Pennsylvania Supreme Court in the following manner:

4. The fact that the victim in *Simmon* was on juvenile probation while the victim in the instant case was on adult probationary status is of no significance.

■■■■■■■■■■■■■

The threshold inquiry in such claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). If this threshold is met, it must next be established that the particular course chosen by counsel had no reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). Finally, we require that the defendant establish how counsel's commission or omission prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

*Commonwealth v. Durst*, 522 Pa. 2, 4–5, 559 A.2d 504, 505 (1989). In order to demonstrate prejudice under this standard, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984). See: *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

*Commonwealth v. Horton*, 434 Pa.Super. 478, 485–486, 644 A.2d 181, 185 (1994).

■■■ As a general rule, matters of trial strategy are left to the determination of counsel, and a defendant is not entitled to appellate relief simply because a chosen strategy is unsuccessful. See: *Commonwealth v. Tippens*, 409 Pa.Super. 536, 542, 598 A.2d 553, 556 (1991) (en banc). " '[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Commonwealth v. Lee*, 401 Pa.Super. 591, 600–601, 585 A.2d 1084, 1089 (1991), quoting *Strickland v. Washington*, 466 U.S. 668,

690–691, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 695 (1984). "The decision not to present a particular defense is a tactical one and will not be deemed ineffective stewardship if there is a reasonable basis for that position." *Commonwealth v. Blair*, 491 Pa. 499, 506, 421 A.2d 656, 660 (1980). See, e.g.: *Commonwealth v. McGrogan*, 449 Pa. 584, 297 A.2d 456 (1972) (strategy seeking acquittal rather than one seeking verdict of manslaughter was effective assistance); *Commonwealth v. Garcia*, 370 Pa.Super. 132, 535 A.2d 1186 (1988) (counsel's decision to forego alternative theory of voluntary manslaughter and rely solely upon theory of self-defense was not ineffective assistance). Accordingly,

"[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). We inquire whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect defendant's interests. See *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973). Thus, counsel's assistance is deemed constitutionally effective once we are able to conclude the particular course chosen by counsel had some reasonable basis designated to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604, 235 A.2d 349 (1967).

*Commonwealth v. Harper*, 419 Pa.Super. 1, 11, 614 A.2d 1180, 1185 (1992), quoting *Commonwealth v. Dunbar*, 503 Pa. 590, 596, 470 A.2d 74, 77 (1983).

■■ Appellant's principal claim of ineffective assistance pertains to counsels' failure to request that the jury be instructed on principles involving the defense of justification/self-defense. The law is well settled that "[a] trial court is not obligated to instruct a jury upon legal principles which have no applicability to the presented facts. There must be

some relationship between the law upon which an instruction is [requested] and the evidence presented at trial." *Commonwealth v. Tervalon*, 463 Pa. 581, 593, 345 A.2d 671, 678 (1975). See also: *Commonwealth v. Crews*, 536 Pa. 508, 532, 640 A.2d 395, 407 (1994); *Commonwealth v. Bryant*, 524 Pa. 564, 573, 574 A.2d 590, 595 (1990). However, " '[a] defendant is entitled to an instruction on any recognized defense which has been requested, which has been made an issue in the case, and for which there exists evidence sufficient for a reasonable jury to find in his or her favor.' " *Commonwealth v. Borgella*, 531 Pa. 139, 142, 611 A.2d 699, 700 (1992), quoting *Commonwealth v. Weiskerger*, 520 Pa. 305, 312–313, 554 A.2d 10, 14 (1989). See also: *Commonwealth v. Lightfoot*, 538 Pa. 350, 355, 648 A.2d 761, 764 (1994).

▮▮▮ At trial, appellant was represented by Attorneys Lisa Lazzari and Donald Carosella. During the post-trial evidentiary hearing, both Lazzari and Carosella were questioned regarding their decision not to request a jury instruction on self-defense. Both expressed the view, on direct examination, that an instruction on self-defense would have been inappropriate and inconsistent with appellant's claim that the stabbing was accidental. During the cross-examination, however, Attorney Lazzari testified as follows:

Q. To put it bluntly wasn't there an indication made both to you by Mr. Buksa in conversation with him as well as the trial that any injuries or that that were obtained were basically received by the victim in the defendant's attempt to defend himself?

A. Well you could look at it in two respects. It was my opinion from what Mr. Buksa told me was it was an attempt by Mr. Buksa to get the knife out of the car so that neither would be injured.

Q. Well, in your closing argument to the jury didn't you say about the defendant that "and rather than being a helpless victim, he defends himself against Mr. Pejack." I ask you to look at page ten of the transcript of May 10th and I underlined it. Didn't you indicate "rather than being

a helpless victim, he defends himself [against] Mr. Pejack."
Didn't you make reference to that to the jury?

A. Yes.

Q. And to move down a little further we have a description somewhat similar but somewhat vastly apart of the struggle that ensued and you made mention of the struggle that ensued; did you not?

A. Yes.

Q. And then, of course, you said that you made mention of your client being injured but unfortunately the victim was hurt worse?

A. Yes.

Q. So it wasn't any mystery that you were making some assertions that what happened here was only as a result of him defending himself; is that correct?

A. What happened was a result of the initiation by Mr. Pejack, not by Mr. Buksa.

Q. Right, I mean you did use the words he defends himself; is that correct?

A. Yes, I did.

. . . .

Q. And you indicated that to the jury. What was the strategy in not asking for an instruction on self-defense?

A. I don't believe it met the legal requirements. There was no retreat.

Q. Well doesn't he have to be able to retreat with complete safety?

A. He could have got out of the vehicle.

Q. But couldn't you argue for your client—

A. Yes.

Q.—that because the guy pulled the knife on him and all of a sudden he wants more money and it happened so quick that there was no time to retreat? Couldn't you argue that?

A. Yes.

Q. And then therefore that the jury believes hey in order to retreat safely you first have to have that opportunity. And if you don't, then wouldn't that self-defense instruction fit?

A. Yes.

Q. And isn't it up to the jury to determine basically up to your argument on behalf of your client as to whether or not there was an ability or duty to retreat?

A. Yes.

N.T. October 14, 1993, at pp. 46–49.[5]

Attorney Carosella was cross-examined also and testified as follows:

Q. And don't you agree the incident about cutting the head, that occurred during this struggle and the tumbling that occurred out of the car according to Mr. Buksa; is that correct?

A. Yes.

Q. I believe you also said while he was defending himself; is that right?

A. If you want to use those words, yes.

5. In her closing statement to the jury at appellant's trial, Attorney Lazzari had argued as follows:

And now Mr. Buksa is not only frightened, but now he is getting mad. And rather than being a helpless victim, *he defends himself against Mr. Pejack.* Physically he offers no threat to my client. With a knife, that's a different story. So he grabs the knife. And we have heard two [descriptions], somewhat similar, but somewhat vastly apart of the struggle that proceeds after Mr. Buksa grabs the knife from David Pejack—or his wrist, I should say. *They tumble out of the car. They end up on the ground. Mr. Buksa's eye is injured in the struggle. Mr. Pejack is unfortunately injured to a greater degree.* With or without the knife, there is no way Mr. Pejack could have overpowered my client. And based on that fact, I tell you that [if] Mr. Buksa's original intentions were to assault this man, sexually or physically, he would have succeeded in what he set out to do. But what happened instead? *They tumbled out of the car. He got the knife. And in an attempt to ward off Mr. Pejack, Mr. Pejack was then cut.* My client subdues him, realizes there is no more danger, tosses the knife away, and then sees the degree to which Mr. Pejack is injured. Immediately he realizes something has to be done.

N.T. May 10, 1993, at pp. 10–11 (emphasis added).

Q. And generally, Attorney Carosella, when your client testifies that these things occurred while I'm defending myself and your co-counsel argues to the jury that these occurred while he is defending himself, struggling, those type of things, you don't believe in your mind it wouldn't prompt you to request a self-defense instruction from the Court?

A. We didn't at the time, no.

Q. What was the tactical advantage of not doing that?

A. The idea at least in my mind was that it was strictly an accident. We didn't want to call too much more attention to the idea that it was so much necessary to defend as it was simply an accident that occurred in the course of the struggle. It's a call.

N.T. October 14, 1993, at pp. 68–69.

Several cases have considered whether a defendant is entitled to a jury charge on self-defense where there is evidence indicating that an accidental injury or death was caused by the defendant while he was attempting to defend himself from attack. In *Commonwealth v. Webster*, 490 Pa. 322, 416 A.2d 491 (1980), the Supreme Court rejected a claim of ineffective assistance based upon counsel's failure to object to the absence of a jury instruction on self-defense. The *Webster* Court reasoned as follows:

The Commonwealth's witnesses testified that appellant pointed the gun at the victim. Only appellant claimed the victim pointed the gun at him. He testified that as he struggled to wrestle the pistol free, it discharged. At best appellant's explanation suggests that the killing may have been accidental. However, it also destroys the second element of self-defense; that appellant reasonably believed that he was in imminent danger of death or great bodily harm. *When appellant was specifically asked upon cross-examination if he had been acting in self-defense, appellant conceded that he had not.* At no time was there any testimony that appellant intentionally fired the gun in an attempt to defend himself.

The jury was presented with the possible explanation of accidental death; the judge's charge adequately explained that a finding of not guilty of any degree of homicide was required if the jury chose to believe appellant's story.

Clearly, appellant's trial counsel realized that an assertion of self-defense was not supported by, nor compatible with the testimony. It would have been an empty gesture for defense counsel to object to the court's charge.

*Id.* at 326, 416 A.2d at 492–493 (footnote omitted) (emphasis added).

In *Commonwealth v. Mayfield,* 401 Pa.Super. 560, 585 A.2d 1069 (1991) (en banc), the defendant testified that he had pulled out a knife because the victim had "said he was going to kill me," but he denied having actually stabbed the victim. The defendant admitted, however, that he had been struggling with the victim and that he had bit the victim in the chest in response to being choked. The Superior Court concluded that such testimony constituted

a sufficient showing that he used deadly force in defense of himself to at least allow for an instruction on self-defense. *Appellant at no time denied that he produced the deadly weapon with intent to use it in his own defense.*

It remains the province of the jury as to whether appellant was free of provocation, as to whether he had a duty to retreat, as to whether his belief that he was in danger of serious bodily harm or death was reasonable, and as to whether his use of deadly force was excessive under the circumstances.

*Commonwealth v. Mayfield, supra* at 578–579, 585 A.2d at 1078 (emphasis added).

Subsequently, in *Commonwealth v. McFadden,* 402 Pa.Super. 517, 587 A.2d 740 (1991), the Court found arguable merit in a contention that counsel had been ineffective for failing to request a jury instruction on self-defense where the defendant testified that her ex-husband had been shot accidentally while struggling with her over a shotgun. The defendant's testimony was that she had borrowed the gun to protect herself from

her abusive ex-husband, and that the shooting had occurred while he had been hitting her and after he had grabbed the gun. The *McFadden* Court declared "that a self-defense charge is appropriate in cases involving accidental injury when 'the circumstances of the case allow that the accidental injury or death occurred within the course of the actor defending himself.'" *Id.* at 522, 587 A.2d at 742, quoting *Commonwealth v. Mayfield, supra* at 572, 585 A.2d at 1074. The Court further reasoned that:

> The testimony of appellant did not "negate any element of self-defense" that would preclude the necessity to submit the issue to the jury on request of the defendant. *See: Commonwealth v. Mayfield, supra,* 401 Pa.Superior Ct. at 571, 585 A.2d at 1074. Moreover, the testimony of appellant that she feared for her life and did not remember where she pointed the gun, or whether her finger was on the trigger, if believed by the jury, would have justified a finding that appellant acted in self-defense. *See e.g., Commonwealth v. Gonzales,* 334 Pa.Super. 603, 607–608, 483 A.2d 902, 904 (1984). While the Commonwealth continues to argue that a self-defense charge was not required because appellant refused to admit that she had fired the weapon purposefully, the submission of a self-defense charge does not require such an admission. *Commonwealth v. Gonzales, supra* 334 Pa.Super. at 609, 483 A.2d at 905. *See: Commonwealth v. Mayfield, supra,* 401 Pa.Super. at 576–577, 585 A.2d at 1077.

*Commonwealth v. McFadden, supra* at 525–526, 587 A.2d at 744.

Finally, in *Commonwealth v. Wilson,* 433 Pa.Super. 28, 639 A.2d 1194 (1994), *allocatur granted,* 539 Pa. 245, 652 A.2d 281 (1994), the refusal by a trial court to instruct the jury on self-defense was held to be reversible error where the defendant had testified that he accidentally shot the victim while struggling to prevent the victim from shooting him. In so holding, the Superior Court opined:

> [W]e conclude that there was in appellant's testimony nothing to negate any of the elements of self-defense. Rather,

appellant's testimony was that while struggling over a gun which the victim had pointed at him, the gun had accidently discharged when he fell and hit his elbow on the ground. From this testimony, a reasonable jury could have concluded that the shooting, although accidental in nature, occurred while appellant was defending himself. Under these circumstances, the decided cases suggest, appellant was entitled to a jury instruction on self-defense. See: *Commonwealth v. McFadden, supra* 402 Pa.Super. 517, 587 A.2d 740; *Commonwealth v. Mayfield, supra* 401 Pa.Super. 560, 585 A.2d 1069.

The instant case is distinguishable from *Commonwealth v. Webster, supra,* where the defendant, during cross-examination, specifically denied that he had acted in self-defense. In the instant case, as we have observed, appellant's testimony did not negate any of the elements of self-defense and did not refute the possibility that he was struggling for the gun to protect himself. Upon request, therefore, appellant was entitled to have the jury instructed upon the law pertaining to self-defense. When the trial court denied appellant's request for such an instruction, it committed reversible error. Consequently, a new trial is necessary. *Commonwealth v. Wilson, supra* 433 Pa.Super. at 37–38, 639 A.2d at 1199.

In the instant case, appellant testified that it was the victim who had pulled the knife and had attempted to rob him. Appellant described a struggle during which he was able to gain control of the knife. The victim, however, continued the struggle by striking appellant in the eye with his thumb. This, according to appellant, caused him to bring his hands up to his face, thereby stabbing the victim, who was standing over him. Thus, there was nothing in appellant's testimony to negate any of the elements of self-defense. Rather, the circumstances described by appellant were that the victim had been accidentally injured while the defendant had been defending himself against the victim's aggression. Under such circumstances, the decided cases hold that a defendant is entitled to have the jury instructed upon the law pertaining to self-defense. See: *Commonwealth v. Wilson, supra* 433 Pa.Super. 28, 639 A.2d 1194; *Commonwealth v. McFadden,*

*supra* 402 Pa.Super. 517, 587 A.2d 740; *Commonwealth v. Mayfield, supra* 401 Pa.Super. 560, 585 A.2d 1069.

■ The decision by appellant's trial counsel not to request a jury instruction on self-defense under the circumstances of this case was so unreasonable that no competent lawyer would have employed the same strategy. Counsels' decision was based upon their erroneous belief that a claim of an accidental stabbing was inconsistent with self-defense, even where evidence suggested that the accidental injury had occurred while the defendant was defending himself against attack. Counsels' decision was especially unreasonable in light of the closing argument which stressed appellant's defense of himself and contended that the injury to the victim had occurred while appellant was attempting to "ward off" the victim's attack. Because the issue of self-defense was placed squarely before the jury by defense argument and because there existed sufficient evidence, which, if believed by the jury, would have permitted a finding of self-defense, the failure of trial counsel to request that the jury be properly instructed regarding principles of self-defense constituted constitutional ineffectiveness.[6] Their failure to do so failed to serve any interest of the client.

Appellant has also argued that his trial counsel were ineffective because they:

(1) failed to have the preliminary hearing testimony transcribed;

(2) failed to cross-examine the alleged victim adequately;

(3) failed to call two material witnesses for the defense; and

(4) failed to present physical evidence which would have corroborated appellant's version of events.

**6.** As for Attorney Lazzari's suggestion that appellant had failed to retreat, it clearly would have been for the jury to determine whether appellant had had the opportunity to retreat safely prior to the time the victim was stabbed. See: *Commonwealth v. Mayfield, supra,* 401 Pa.Super. at 579, 585 A.2d at 1078.

After reviewing the record and the opinion of the trial court, however, we are satisfied that these arguments are lacking in merit.

Because the trial court erred by refusing to allow cross-examination of the alleged victim regarding his probationary status, and because trial counsel were constitutionally ineffective for failing to request a jury instruction on self-defense, the judgment of sentence will be reversed and the case remanded for a new trial.

The judgment of sentence is reversed, and the case is remanded for a new trial. Jurisdiction is not retained.