J-S24021-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRYAN WAYNE BRACKBILL, JR., | : | |
| | : | |
| Appellant | : | No. 714 MDA 2017 |

Appeal from the PCRA Order, March 28, 2017,
in the Court of Common Pleas of York County,
Criminal Division at No(s): CP-67-CR-0005421-2013.

BEFORE: OLSON, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JUNE 13, 2018**

Bryan Wayne Brackbill, Jr. appeals from the order denying his first petition for relief pursuant to the Post Conviction Relief Act ("PCRA"), following his conviction for second-degree murder and theft by unlawful taking. 42 Pa.C.S.A. §§ 9541-9546. Brackbill's counsel has filed a petition to withdraw. We affirm the order denying Brackbill post-conviction relief and grant counsel's petition.

The pertinent facts, as summarized from the trial testimony, are as follows: Brackbill lived with the victim, Sandra Mulder, on and off over the last several years. According to Lisa Power, the victim's daughter, her mother took Brackbill "under her wing" and the two shared a mother/son relationship. N.T., 8/12/14, at 190.

Toward the end of May 2013, Brackbill and his then girlfriend, Crystal Hughes, were sharing a basement bedroom at the victim's house. At that time, Brackbill had recently been arrested for driving under the influence and therefore was wearing an alcohol-monitoring bracelet. At this same time, Brackbill was going to begin working for William Snyder, who had a small construction company. However, once Brackbill decided to cut off his bracelet, and the county probation department knew that he resided at the victim's house, Brackbill needed to find a new place to live. Brackbill and Hughes then moved in with William Snyder and his wife, Shawn, until they could make other living arrangements.

On May 31, 2013, Shawn had planned to drive her daughter's car to her daughter at the Mayo Clinic in Minnesota. Although she had only met Hughes briefly, Shawn agreed that Hughes would accompany her on the road trip. The two women departed, and Hughes left her cell phone with Brackbill.

After his wife left, William Snyder dropped Brackbill off at the Parkside Bar in Hershey, while he went to a doctor's appointment. Snyder later reunited with Brackbill, and the two men had a few drinks before leaving that establishment and traveling to Arooga's, a sports bar. The men shared a pitcher of beer there. Eventually, Brackbill told Snyder "he had to go to a meeting or he needed to go do something." N.T., 8/11/14 at 129. Snyder left Brackbill at the bar and went home.

Later that evening, Snyder received a call from an acquaintance who told him that Brackbill was still at Arooga's, and was "saying some nasty

things" about Snyder. N.T., 8/11/14, at 130. As a result, Snyder drove back to Arooga's, and had the bouncers escort Brackbill out of the bar. Snyder then told Brackbill to wait outside for Snyder to take him home. When Snyder later exited the bar and returned to the parking lot, Brackbill was gone.

Once again, Snyder returned to his home alone. In the early morning hours of the next day, June 2, 2013, Brackbill appeared at Snyder's home in order to collect his belongings. Snyder would not let Brackbill in, and, in fact, punched Brackbill in the face. During this encounter, Snyder saw the victim standing at the bottom of the steps waiting for Brackbill.

Meanwhile, Shawn Snyder and Hughes had stopped for the night at a hotel in Indiana. Over the course of the night, Shawn received multiple calls from Brackbill, and each time she gave the phone to Hughes. Hughes would speak to Brackbill either on the phone or by text. According, to Hughes, Brackbill believed she had left with Shawn so that she could cheat on him. During one of these exchanges, Brackbill told Hughes that he was coming for her and that she was to wait at the hotel. Hughes testified that she could hear the victim's voice in the background yelling that she would not allow Brackbill to use her car for that purpose.

Later on June 2, 2013, Brackbill traveled to Indiana to pick up Hughes. He was driving the victim's car. According to Hughes, Brackbill "wanted to go down South." N.T., 8/12/14, at 262. While en route, Lisa Power called Hughes's cell phone and asked Brackbill if he knew of her mother's whereabouts. Hughes testified that Brackbill told Lisa that he last saw her

- 3 -

mother the evening before and that she was probably at home. After ending the call, Brackbill's demeanor changed. He told Hughes that he "had to go" because "he had did something bad." N.T., 8/12/14, at 266. According to Hughes, Brackbill eventually "said he killed [the victim]." *Id.* Brackbill dropped Hughes off at a McDonald's in Indianapolis because "he didn't want [her] to be involved in it." N.T., 8/12/14, at 267.

Throughout the day of June 2, 2013, Lisa Power unsuccessfully attempted to contact her mother several times. Both Lisa and her husband, Andrew, traveled to her mother's home, found it locked, and they did not have a key. According to Lisa, the light in her mother's room was on, and she could hear music playing through an open basement window. Andrew was able to remove the screen, and entered that room, which had been Brackbill's bedroom. As he walked past what he had first believed to be a pile of laundry, Andrew discovered the victim's body face down and bound with duct tape. Andrew shook the victim by the shoulder but received no response. He then let Lisa in through the front door, and she too shook her mother to no avail. They then called 911.

Meanwhile, after leaving Hughes at the McDonald's in Indianapolis, Brackbill continued to travel west. The Missouri State Patrol eventually apprehended him approximately 140 miles west of St. Louis.

At the conclusion of a four-day trial on August 14, 2014, the jury convicted Brackbill of second-degree murder and theft by unlawful taking. At Brackbill's request, the trial court immediately sentenced him to an aggregate

term of life in prison. Brackbill filed a timely appeal to this Court. We affirmed

his judgment of sentence in an unpublished memorandum filed on September

8, 2015, and our Supreme Court denied allowance of appeal on December 28,

2015. **See Commonwealth v. Brackbill**, 133 A.3d 65 (Pa. Super. 2015),

*appeal denied*, 130 A.3d 1285 (Pa. 2015).

Brackbill filed a *pro se* PCRA petition, and the PCRA court appointed

counsel. Following a number of continuances, the PCRA court held an

evidentiary hearing on September 9, 2016. Although he called trial counsel

to testify, Brackbill did not testify regarding his multiple claims of trial

counsel's alleged ineffectiveness. At the conclusion of the hearing, the PCRA

court denied the petition. This appeal follows. Both Brackbill and the PCRA

court have complied with Pa.R.A.P. 1925.

In lieu of an advocate's brief, Brackbill's counsel has filed a copy of her

no-merit letter and accompanying argument pursuant to the dictates of

**Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988), and **Commonwealth

v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*). Thus, we will assess

counsel's assertion that the issues Brackbill wishes to raise on appeal have no

merit under a **Turner**/**Finley** analysis.

This Court has summarized:

> The **Turner**/**Finley** decisions provide the manner for
> post[-]conviction counsel to withdraw from representation.
> The holdings of those cases mandate an independent review
> of the record by competent counsel before a PCRA court or
> [an] appellate court can authorize an attorney's withdrawal.
> The necessary independent review requires counsel to file a
> "no-merit" letter detailing the nature and extent of his [or

her] review and list each issue the petitioner wishes to have examined, explaining why those issues are meritless. The PCRA court, or an appellate court if the no-merit letter is filed before it, *see Turner*, *supra*, then must conduct its own independent evaluation of the record and agree with counsel that the petition is without merit[.]

[T]his Court [has] imposed additional requirements on counsel that closely track the procedure for withdrawing on direct appeal. . . . [C]ounsel is required to contemporaneously serve upon his [or her] client his [or her] no merit letter and application to withdraw along with a statement that if the court granted counsel's withdraw request, the client may proceed *pro se* or with a privately retained attorney[.]

*Commonwealth v. Reed*, 107 A.3d 137, 140 (Pa. Super. 2014) (citation omitted). Counsel has complied with the mandates of *Turner* and *Finley*, as summarized in *Reed*, *supra*. Thus, we must determine whether we agree with counsel's assessment of Brackbill's claims.

Brackbill wished to raise on appeal claims that his trial counsel's assistance was ineffective for failing to: (1) argue the motives of Andrew and Lisa Power to commit the victim's murder; (2) present evidence that he had an intimate relationship with the victim; (3) subpoena Lisa Power's cell phone records; (4) present evidence of crime scene contamination; (5) seek DNA testing of Lisa and Andrew Power; (6) challenge for cause three jurors; (7) investigate the police's mishandling of the crime scene; and (8) establish that Hughes lied when she denied at trial that she had been promised a benefit in exchange for her testimony. *See Turner*/*Finley* Letter at 5-10.

Our scope and standard of review is well settled:

> In PCRA appeals, our scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. Because most PCRA appeals involve questions of fact and law, we employ a mixed standard of review. We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions *de novo.*

*Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 779 (Pa. Super. 2015) (internal citations and quotations omitted).

To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish, by a preponderance of the evidence, that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." *Id.* This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. *Id.* at 533.

Moreover, trial counsel's strategic decisions cannot be the subject of a finding of ineffectiveness if the decision to follow a particular course of action was reasonably based and was not the result of sloth or ignorance of available alternatives. *Commonwealth v. Collins*, 545 A.2d 882, 886 (Pa. 1988) (cited with approval by *Commonwealth v. Hall*, 701 A.2d 190, 204 (Pa.

1997)). Counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." ***Commonwealth v. Ervin***, 766 A.2d 859, 862-63 (Pa. Super. 2000) (quoting ***Commonwealth v. Miller***, 431 A.2d 233, 234 (Pa. 1981). Our Supreme Court has defined "reasonableness" as follows:

> Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable* basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

***Commonwealth v. Pierce***, 527 A.2d 973, 975 (Pa. 1987) (quoting ***Com. ex rel. Washington v. Maroney***, 235 A.2d 349, 352-53 (Pa. 1967)). ***See also Commonwealth v. Clark***, 626 A.2d 154, 157 (Pa. 1993) (explaining that a defendant asserting ineffectiveness based upon trial strategy must demonstrate that the "alternatives not chosen offered a potential for success substantially greater than the tactics utilized)." A defendant is not entitled to appellate relief simply because a chosen strategy was unsuccessful. ***Commonwealth v. Buksa***, 655 A.2d 576, 582 (Pa. Super. 1995).

Finally, a finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Id.*** In assessing a claim of ineffectiveness, when it is clear that appellant has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone,

without a determination of whether the first two prongs have been met. ***Commonwealth v. Travaglia***, 661 A.2d 352, 357 (Pa. 1995). Counsel cannot be deemed ineffective for failing to pursue a meritless claim. ***Commonwealth v. Loner***, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*).

After careful review, we conclude that the Honorable Michael E. Bortner has prepared a thorough and well-reasoned opinion that correctly disposes of each of Appellant's ineffectiveness claims. As to each allegation, Judge Bortner, discusses all three prongs of the ineffectiveness test. He then explains why trial counsel's chosen strategy was reasonable, and why the alternatives suggested by Brackbill did not offer "a potential for success substantially greater than the tactics utilized" by trial counsel. ***Clark***, ***supra***.

We therefore adopt Judge Bortner's December 1, 2017 opinion as our own in disposing of the present appeal. In doing so, we further concur with Judge Bortner that, given the overwhelming evidence of guilt, including his confession to Hughes, Brackbill could not establish prejudice. In addition, because we agree with counsel's assessment of Brackbill's claims on appeal, we grant her petition to withdraw. The parties are directed to attach a copy of the trial court opinion to this memorandum in the event of further proceedings.

Petition to withdraw granted. Order affirmed.

Judge Musmanno joins.

Judge Olson concurs in result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 06/13/2018