J-S49028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GEORGE HAROLD FINK, SR., | |
| Appellant | No. 1683 MDA 2014 |

Appeal from the PCRA Order entered September 15, 2014,
in the Court of Common Pleas of Luzerne County,
Criminal Division, at No(s): CP-40-CR-0001974-2006

BEFORE: BENDER, P.J.E., ALLEN, and OLSON, JJ.

MEMORANDUM BY ALLEN, J.: **FILED AUGUST 17, 2015**

George Harold Fink, Sr. ("Appellant") appeals from the order denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. sections 9541-46. We affirm.

The pertinent facts and procedural history are as follows: Following a non-jury trial held on May 14, 2007, Appellant was found guilty of first-degree murder and related offenses. The PCRA court summarized the pertinent trial testimony as follows:

> [Appellant] had an ongoing relationship with [the victim]. On or about January 21, 2006, the Pennsylvania State Police received a report of a suspicious death at the home of [the victim]. Sharon Steeber testified that she received a call from her nephew, [Appellant,] on the morning of January 20th, around 9:00 a.m. [Appellant] called requesting a ride to the area of Hunlock Creek. Sharon Steeber was concerned because [the victim], [Appellant's] ex-girlfriend, secure[d] a PFA against [Appellant] and she, Steeber, was concerned because

[Appellant] had made threats against [the victim] in December, 2005. Steeber testified that [Appellant] told her "that he was going to either make her pay or kill her." [**See** N.T., 5/14/07, at 44-54]. [Ms. Steeber refused to give Appellant a ride. **Id.**]

On January 20, 2006 at 2:30 to 3:00 p.m., [Appellant] called his cousin Debra Leichleitner and "asked for a ride to the Hunlock Creek area to stay at a buddy's house". Leichleitner also testified she and her daughter dropped [Appellant] off on Church Road in the Hunlock Creek area between 6:15 and 6:30 p.m. [**See id.**, at 15-24].

Rebecca Thompson testified she was raising [the victim's] daughter. She knew [Appellant] and he would call her and discuss [the victim]. Ms. Thompson testified that [Appellant] stated ". . . he was going to use a needle to kill her and himself." The conversation took place a few weeks before Christmas, the year prior to the victim's death.

Ms. Thompson testified that [Appellant] was becoming more obsessed because "[the victim] was running around on him . . . he had been watching her from across the street and following her". Ms. Thompson additionally testified that she called and warned [the victim] of [Appellant's] calls to her. [**See id.** at 25-43].

Margaret Dorris testified that she was a lifelong friend of [Appellant] and he [had] called her on Saturday, a week before [the victim's] death; that [Appellant] was "going to kill [the victim] and himself". Ms. Dorris stated "she pleaded for [Appellant] to let it go, there were other women in the world, his mom was ill and needed him but [Appellant] said he was going to kill [the victim] and himself with [a] syringe." [**See id.** at 71-80].

Danielle Campbell testified she is the step-daughter of [Appellant] and that weeks before [the victim's] death [Appellant] stated on a number of occasions that "[the victim] would go first". [**See id.**, at 80-95].

Dawn Gardner testified that [the victim] was her mother and she knew [Appellant]. She testified [that] on several occasions she heard voice mails on her mother's phone with [Appellant stating] he loved her and violent

messages indicating that he was going to get her. She also testified [that] in January, 2006, her mother was dating Dennis Murphy and she had "his picture and a stuffed cow he had given her in her bedroom." [*See* N.T., 5/14/07, at 95-111).

Dr. Gary Ross, a pathologist, testified he performed an autopsy on the body of [the victim] on January 22, 2006. His external examination revealed [multiple injuries including petechial small focal hemorrhages of the thin membrane of the eye].

\*\*\*

Dr. Ross testified petechial hemorrhages are noted in asphyxial-type death and that [the victim] had been dead for 24-36 hours prior to her body being discovered.

An internal examination was performed which was essentially normal except for the lump which showed marked pulmonary edema which is consistent with the asphyxial-type death. Dr. Ross also noted a sticky glue-like residue consistent with the glue from the duct tape. Dr. Ross stated [the] cause of death was asphyxia due to smothering and [the] manner of death was homicide. [*See id.,* at 55-64]*.*

After the prosecution rested, the defense called Dr. Richard Fischbein who reviewed the affidavit of probable cause, statements, medical records and [Appellant's] previous criminal record prior to his initial examination of [Appellant].

Dr. Fischbein opined that [Appellant's] statement during the examination were consistent with the documents he reviewed. [Appellant] told Dr. Fischbein he had gone to [the victim's] residence, entered and awaited her arrival. He went there with a syringe to kill himself in front of her as a way of demonstrating how "she had messed with him" and how bad he felt. [*See id.*, at 203].

Upon [the victim's] arrival, she was talking with her boyfriend which [Appellant] overheard. [The victim] talked of marrying her boyfriend as she had with [Appellant]. [Appellant] grabbed her, taped her hand, and cut his thumbs [sic] with a knife. After sharing a cigarette,

- 3 -

the victim talked to [Appellant] about going in to the bedroom for intercourse. [Appellant] was not able to perform and [the victim] belittled him. [Appellant] snapped and awakened with his hands around [the victim's] neck. [**See** N.T., 5/14/07, at 203-05].

Dr. Fischbein concluded that [Appellant] was suffering from a major depression, recurrent, passive-aggressive personality disorder with borderline and histrionic features. [**See id.**, at 214-15].

PCRA Court Opinion, 9/15/14, at 5-8.

On July 26, 2007, the trial court sentenced Appellant to life in prison for his murder conviction, and imposed concurrent sentences on the remaining convictions. Appellant ultimately appealed[1], and in an unpublished memorandum filed on July 19, 2012, this Court affirmed Appellant's judgment of sentence. **Commonwealth v. Fink**, 55 A.3d 141 (Pa. Super. 2012). On March 12, 2013, our Supreme Court denied Appellant's petition for allowance of appeal. **Commonwealth v. Fink**, 63 A.3d 774 (Pa. 2013).

On November 8, 2013, Appellant filed a *pro se* PCRA petition. The PCRA court appointed counsel, and PCRA counsel filed a supplemental petition, in which Appellant raised multiple claims of trial counsel's alleged ineffectiveness. The PCRA court held an evidentiary hearing on July 22, 2014, at which both Appellant and trial counsel testified, and the PCRA court took the matter under advisement. By opinion and order entered September

_____

[1] The PCRA court has detailed the procedural history, which is not relevant to our disposition. **See** PCRA Court Opinion, 9/15/14, at 2-3.

15, 2014, the PCRA court denied Appellant's PCRA petition. Both Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

Appellant raises one issue on appeal:

> 1. DID THE [PCRA] COURT ERR WHEN IT DENIED APPELLANT'S REQUEST FOR POST-CONVICTION RELIEF IN THE FORM OF A NEW TRIAL, BASED ON THE INEFFECTIVENESS OF APPELLANT'S TRIAL COUNSEL?

Appellant's Brief at 5.

This Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. *Commonwealth v. Halley*, 870 A.2d 795, 799 n.2 (Pa. 2005). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa. Super. 2001). To be entitled to relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that the conviction or sentence arose from one or more of the errors enumerated in section 9543(a)(2) of the PCRA. One such error involves the ineffectiveness of counsel.

To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

*Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." *Johnson*, 966 A.2d at 532. This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. *Id.* at 533. A finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

In assessing a claim of ineffectiveness, when it is clear that appellant has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Travaglia*, 661 A.2d 352, 357 (Pa. 1995). Counsel will not be deemed ineffective if any reasonable basis exists for counsel's actions. *Commonwealth v. Douglas*, 645 A.2d 226, 231 (Pa. 1994). Even if counsel had no reasonable basis for the course of conduct pursued, an appellant is not entitled to relief if he fails to demonstrate the requisite prejudice which is necessary under Pennsylvania's ineffectiveness standard. *Douglas*, 645 A.2d at 232. Counsel cannot be deemed ineffective for failing to pursue a meritless claim. *Commonwealth v.*

*Loner*, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*), *appeal denied*, 852 A.2d 311 (Pa. 2004).

Moreover, trial counsel's strategic decisions cannot be the subject of a finding of ineffectiveness if the decision to follow a particular course of action was reasonable and was not the result of sloth or ignorance of available alternatives. *Commonwealth v. Collins*, 545 A.2d 882, 886 (Pa. 1988) (cited with approval by *Commonwealth v. Hall*, 701 A.2d 190, 204 (Pa. 1997)). Counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Ervin*, 766 A.2d 859, 862-63 (Pa. Super. 2000) (quoting *Commonwealth v. Miller*, 431 A.2d 233, 234 (Pa. 1981). Our Supreme Court has defined "reasonableness" as follows:

> Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable* basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

*Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987) (quoting *Com. ex rel. Washington v. Maroney*, 235 A.2d 349, 352-53 (Pa. 1967)). *See also Commonwealth v. Clark*, 626 A.2d 154, 157 (Pa. 1993) (explaining that a defendant asserting ineffectiveness based upon trial strategy must demonstrate that the "alternatives not chosen offered a potential for success

substantially greater than the tactics utilized"). A defendant is not entitled to appellate relief simply because a chosen strategy is unsuccessful. *Commonwealth v. Buksa*, 655 A.2d 576, 582 (Pa. Super. 1995).

In support of his issue, Appellant asserts "trial counsel were *per se* ineffective because they did not submit the Commonwealth's key evidence against [him] to any meaningful adversarial review" pursuant to *United States v. Cronic*, 466 U.S. 648 (1984), and that this "presumption of prejudice" was recognized by our Supreme Court in cases such as *Halley*, *supra*, and *Commonwealth v. Lantzy*, 736 A.2d 564 (Pa. 1999). *See* Appellant's Brief at 11-14.[2] According to Appellant:

> [P]rejudice should be presumed because of trial counsel's complete failure to submit the Commonwealth's evidence and case to any sort of adversarial testing, specifically the DNA report and the forensic reports regarding [the victim's] time of death. Defense counsel did not contradict any of the Commonwealth's evidence; rather, they only offered a mitigation defense of an altered mental state.
>
> ***
>
> While [trial counsel] did pursue a mental state defense, in a homicide case in which [Appellant was] facing life imprisonment, counsel should have at least requested that an independent analyst view the Commonwealth's scientific reports. In other words, while [trial counsel] pursued another defense, by failing to even scrutinize the Commonwealth's evidence and scientific reports, [they] failed to subject same to any sort of adversarial testing.

---

[2] Three attorneys acted as Appellant's trial co-counsel.

> Specifically, given the Commonwealth's forensic report and [Appellant's] ability to establish an alibi around 4:00 a.m., there is a reasonable possibility that a simple review of the report by an independent party would have established a viable defense.

Appellant's Brief at 14-16 (citations omitted).[3]

Upon thorough review, we conclude that in denying Appellant post-conviction relief, the Honorable Lesa S. Gelb has prepared a well-reasoned and thorough opinion, which correctly addresses Appellant's multiple claims of trial counsel ineffectiveness. Our review of the record supports Judge Gelb's determination that trial counsel prepared a "credible [trial] strategy of diminished capacity supported by expert testimony [that] was not so unreasonable that no competent lawyer would have followed it." PCRA Court Opinion, 9/15/14, at 21-22 (citations omitted). *See Ervin*, *supra*. We therefore adopt Judge Gelb's September 15, 2014 opinion as our own, and affirm her decision to deny Appellant post-conviction relief.

Order affirmed.

P.J.E. Bender joins the memorandum.

Judge Olson concurs in the result.

---

[3] Appellant also asserts that he can establish prejudice under the tri-partite ineffectiveness test. However, in his assertion, he simply asserts that prejudice "should be presumed due [counsel's] lack of adversarial testing". *See* Appellant's Brief at 18.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/17/2015

## IN THE COURT OF COMMON PLEAS
## OF LUZERNE COUNTY

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CRIMINAL DIVISION– LAW |
| | : | |
| v. | : | |
| | : | |
| GEORGE H. FINK, JR., | : | |
| | : | |
| Defendant | : | No. 1974 of 2006 |

## ORDER

AND NOW, this _18th_ day of _September_, 2012, after review of the briefs submitted in the above-captioned matter, it is hereby **ORDERED AND DECREED** that the Defendant's Motion for Post Conviction Collateral Relief is **DENIED.**

The Clerk of Courts is directed to serve notice of the entry of this Order pursuant to Pa.R.C.P. 114.

BY THE COURT:

Lesa S. Gelb, Judge

2014 SEP 15 PM 3:44
CLERK OF COURTS
LUZERNE COUNTY

26

# APPENDIX B

IN THE COURT OF COMMON PLEAS
OF LUZERNE COUNTY

| COMMONWEALTH OF PENNSYLVANIA | : | CRIMINAL DIVISION– LAW |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| GEORGE H. FINK, JR., | : | |
| | : | |
| Defendant | : | No. 1974 of 2006 |

## OPINION

### Procedure:

On or about February 7, 2006, George Harold Fink, Sr., hereinafter referred to as "Fink", was charged with Criminal Trespass, False Imprisonment and Criminal Homicide. Defendant Fink was tried before the Luzerne County Court of Common Pleas, Judge Michael T Conahan presiding without a jury, on May 14, 2007. The Commonwealth was represented at trial by Attorneys William T. Finnegan, Nancy Violi and Maureen K. Collins. The Defendant Fink was represented by Attorneys Stephen Menn, Brian C. Corcoran and Matthew P. Kelly.

The Commonwealth presented ten (10) witnesses including Dr. Gary Ross, a pathologist and Pennsylvania State Troopers Sgt. Raymond Whittaker and Christopher Wegrzynowicz. Also testifying on behalf of the Commonwealth were Debra Lechleitner (Defendant's cousin), Rebecca Thompson (raising victim's daughter), Sharon Steeber (Defendant's aunt), Margaret Dorris (Defendant's friend), Danielle Campbell (stepdaughter), Dawn Gardner (victim's daughter) and Christopher Fink (Defendant's nephew).

The defense presented the testimony of Dr. Richard Fischbein, a board certified psychiatrist.

On July 26, 2007 Judge Conahan, as finder of fact, found the Defendant guilty on all counts, i.e. murder in the first degree, criminal trespass and false imprisonment.

The Defendant filed timely post-trial motions asserting a single issue for review, "whether the trial court erred in denying his pre-trial and trial motion to suppress statements obtained and introduced in violation of his Miranda rights". [See: Miranda v. Arizona, 384 U.S. 426 (1966)].

The Defendant, through counsel, filed an appeal with the Superior Court on August 23, 2007. The Superior Court found the sole issue raised waived and affirmed the trial court judgment of sentence on September 22, 2009, noting "appellant does not make a single allegation of a Miranda violation". An allowance of appeal to the Supreme Court was denied on March 12, 2013.

On or about January 8, 2010, "Fink" filed a Petition for Post Conviction Collateral Relief pursuant to the Post Conviction Relief Act ("PCRA")(42 Pa. C.S.A. §9514-9456).

The pro se Petition was assigned to Judge William Amesbury on February 3, 2010 who, by Order, appointed Attorney Jeffrey Yelen as conflict counsel. Pursuant to Judge Amesbury's Order, Attorney Yelen filed a supplement to Defendant's Petition for Post-Conviction Collateral Relief, and a "Comprehensive Brief" in support of Fink's pro se petition on March 22, 2010.

2

The PCRA hearing was conducted September 1, 2010 and an order issued with an attendant Opinion of October 6, 2010 denying the requested post-conviction relief. Subsequently the Superior Court vacated the PCRA Court's Order and reinstated Defendant's direct appeal rights since Fink's appellate counsel had failed to properly brief Superior Court regarding the suppression issue. Thereafter, a Notice of Appeal was filed in August, 2011 with regard to the denial of a suppression motion. Judgment of sentence was affirmed on July 19, 2012. A Petition for Allowance of Appeal was docketed to No. 644 MAL 2012 and denied on March 12, 2013.

On November 8, 2013, the instant PCRA was filed. The Defendant asked that both the prior judge recuse himself and his prior conflict counsel. The undersigned judge was assigned on April 11, 2014. An Order scheduling the PCRA was issued on April 15, 2014 following a preliminary scheduling Order filed by Judge Amesbury on March 5, 2014. The hearing was held on July 22, 2014.

Judge Amesbury previously appointed Atty. Hugh Taylor as conflict counsel. Pursuant to this Court's Order, Atty. Taylor filed a supplement to Defendant's PCRA Petition and a comprehensive brief in support of Fink's pro se petition of November 8, 2013.

In his current Petition Fink alleges:

a)     appellate counsel rendered constitutionally ineffective assistance in failing to raise on appeal trial counsel's ineffectiveness in advising the Defendant not to testify in his own behalf that rendered the decision not knowingly and intelligently made.

3

b)      appellate counsel rendered constitutionally ineffective assistance by failing to raise on appeal trial counsel's ineffectiveness in his lack of preparation for a presentation of Defendant's case at trial.

c)      all prior counsel rendered constitutionally ineffective in failing to preserve and or raise on appeal trial counsel's ineffectiveness for tendering a waiver of trial by jury that was unknowingly and unintelligently made, denying the Defendant the right to a fair and impartial trial before a jury.

Attorney Hugh Taylor in his supplemental petition adds:

a)      failing to hire an expert to properly challenge the time of death of the victim;

b)      failing to adequately prepare for trial, meet with Defendant, review discovery, and consult with or retain an investigator to speak to witnesses;

c)      failing to assert the importance of the lack of DNA evidence of the Defendant on the victim;

d)      failing to adequately challenge potential bias on the part of the judge who sat as the finder of fact;

e)      failing to adequately advise the Defendant of his right to testify at trial, and,

f)      failing to ensure that the Defendant's waiver of this right to a jury trial was knowing, intelligent and voluntary.

4

## Trial Counsel

### Facts:

Fink had an or going relationship with the decedent/victim, Charlene DeWitt. On or about January 21, 2006, the Pennsylvania State Police received a report of a suspicious death at he home of Ms. DeWitt. Sharon Steeber testified that she received a call from her nephew, George Fink on the morning of January 20th, around 9:00 a.m. Fink called requesting a ride to the area of Hunlock Creek. Sharon Steeber was concerned because DeWitt, his ex-girlfriend, secures a PFA against Fink and she, Steeber, was concerned because Fink had made threats against DeWitt in December, 2005. Steeber testified that Fink told her "that he was going to either make her pay or kill her." (See: Trial Transcript pgs. 44-54).

On January 20, 2006 at 2:30 to 3:00 p.m. Fink called his cousin Debra Leichleitner and "asked for a ride to the Hunlock Creek area to stay at a buddy's house". Leichleitner also testified she and her daughter dropped Fink off on Church Road in the Hunlock Creek area between 6:15 and 6:30 p.m. (See: Trial Transcript pgs. 15-24).

Rebecca Thompson testified she was raising Charlene's daughter. She knew George Fink and he would call her and discuss Charlene. Ms. Thompson testified that Fink stated "... he was going to use a needle to kill her and himself." The conversation took place a few weeks before Christmas, the year prior to the victim's death.

Ms. Thompson testified that Fink was becoming more obsessed because "she was running around on him ... he had been watching her from across the street and

5

following her". Ms. Thompson additionally testified that she called and warned Charlene of George's calls to her. (See: Trial Transcript pgs. 25-43).

Margaret Dorris testified she was a lifelong friend of Fink and he called her on Saturday, a week before DeWitt's death; that he (Fink) was going to kill Charlene and himself". Ms. Doris stated "she pleaded for Fink to let it go, there were other women in the world, his mom was ill and needed him but he (Fink) said he was going to kill Charlene and himself with syringe." (See: Trial Transcript pg. 71-80).

Danielle Campbell testified she is the step-daughter of Fink and that weeks before DeWitt's death Fink stated on a number of occasions that "Charlene would go first". (See: Trial Transcript pgs. 80-95).

Dawn Gardner testified that Charlene DeWitt was her mother and she knew George Fink. She testified on several occasions she heard voice mails on her mother's phone with Fink statements he loved her and violent messages indicating he was going to get her. She also testified in January, 2006 her mother was dating Dennis Murphy and she had his picture and a stuffed cow he had given her in her bedroom. (See: Trial Transcript pgs. 95-111).

Dr. Gary Ross, a pathologist, testified he performed an autopsy on the body of Charlene DeWitt on January 22, 2006. His external examination revealed:

(a)   multiple abrasions and ecchymosis on the face, neck, upper and lower extremities bi-laterally and on the chest;

(b)   petechia, small focal hemorrhages on the thin membrane of the eye; and

(c)   hemorrhage within the chest;

6

Dr. Ross testified petechial hemorrhages are noted in asphyxial-type death and that the decedent had been dead for 24-36 hours prior to her body being discovered.

An internal examination was performed which was essentially normal except for the lump which showed marked pulmonary edema which is consistent with the asphyxial-type death. Dr. Ross also noted a sticky glue-like residue consistent with the glue from duct tape. Dr. Ross stated cause of death was asphyxia due to smothering and manner of death was homicide. (See: Trial Transcript pgs. 55-64).

After the prosecution rested, the defense called Dr. Richard Fischbein who reviewed the affidavit of probable cause, statements, medical records and defendant's previous criminal record prior to his initial examination of Fink.

Dr. Fischbein opined that defendant's statement during the examination were consistent with the documents he reviewed. Fink told Dr. Fischbein he had gone to the DeWitt residence, entered and awaited her arrival. He went there with a syringe to kill himself in front of her, as a way of demonstrating how "she had messed with him" and how bad he felt. (Trial transcript, page 203)

Upon her arrival, she was talking with her boyfriend which Fink overheard. She talked of marrying her boyfriend as she had with Fink. He grabbed her, taped her hand, and cut his thumbs with a knife. After sharing a cigarette, the victim talked to Fink about going in to the bedroom for intercourse. He was not able to perform and she belittled him. Fink snapped and awakened with his hands around her neck. (Trial transcript, page 203 -205)

Dr. Fischbein concluded that Fink was suffering from a major depression, recurrent, passive-aggressive personality disorder with borderline and histrionic features. (Trial transcript, page 214-215)

Other matters of significance are that defense counsel, previously filed a Suppression Motion which was heard by the Court on December 18, 2006. The Commonwealth presented testimony from Trooper Christopher Wegrzynowicz and Sgt. Raymond Whittaker. Both the Commonwealth and defense counsel submitted proposed findings of fact and conclusions of law following the suppression hearing.

On January 31, 2007 the Court denied the Suppression Motion but did not file Findings of Fact and Conclusions of Law in accordance with the Pa. R.Crim. P. 581(I). However, the Court's determination was final, conclusive and binding at trial except upon a showing of evidence which was previously unavailable. [See: Pa. R. Crim. P. 581(J)].

Subsequent to the suppression hearing, the Public Defender's Office filed a Motion to withdraw is counsel which was granted by the Court on February 1, 2007.

On February 5 2007, the Court appointed Attorneys Stephen Menn, Brian Corcoran and Matthew Kelly to represent Fink.

8

**Law and Argument:**

Under 42 Pa. C.S 95439a)(2)(ii) Fink is eligible for post conviction relief only where counsel's act or omission "so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place." [See: 42 Pa C.S. 9543(a)(2)(ii)].

Fink's claim will be evaluated pursuant to the three-prong test set out by the Pennsylvania Supreme Court in Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987). In Pierce, our Supreme Court stated that a defendant must establish both inadequate performance and prejudice to sustain a finding of ineffective assistance of counsel. (See: Pierce at 976).

The second prong of Pierce focuses on counsel's performance while the third prong, prejudice, is met if "there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different" citing Strickland v. Washington, 466 U.S. 668 (1984).

In assessing the effectiveness of counsel we first turn our attention to the trial strategy.

The question before this court is whether the Defendant can satisfy all three-prongs of the test set forth in Pierce. They are:

(1) the issue underlying the claim of ineffectiveness has arguable merit;

(2) defense counsel's act or omission was not reasonably designed to advance defendant's interest; and

(3) but for counsel's ineffectiveness a reasonable probability exists that the outcome would have been different (prejudice).

9

Because counse is presumed to be effective, the burden is on the defendant to establish ineffectiv ness. [See: Commonwealth v. Howard, 74 A.2d 941 (Pa. Super. 2000); Commonwealth v. Speight, 677 A.2d 317 (Pa. 1966); 42 Pa. C.S. 9593(a).

## Performance Analysis

In terms of trial counsel, it is alleged that:

1)      counsel failed to hire an expert to properly challenge the time of death of the victim;

2)      counsel failed to adequately prepare for trial, meet with Defendant, review discovery, and consult with or retain an investigator to speak to witnesses;

3)      counsel failed to assert the importance of the lack of DNA evidence of the Defendant on the victim;

4)      counsel failed to adequately challenge potential bias on the part of the judge who sat as the finder of fact;

5)      counsel failed to adequately advise the Defendant of his right to testify at trial, and,

6)      counsel failed to ensure that the Defendant's waiver of this right to a jury trial was knowing, intelligent and voluntary.

As previously stated, because counsel is presumed to be effective, the Petitioner has the bu den of establishing ineffective assistance of counsel. (See: Howard, supra; Speight, supra).

10

Both the Defendant and counsel testified at the PCRA hearing. Petitioner stated that he was represented by Attorney William Ruzzo of the Luzerne County Public Defender's Office up to the suppression hearing. (See: PCRA Hearing Transcript pgs. 5-6). The Suppression Hearing was conducted on December 18, 2006 and findings of fact and conclusions of law were submitted by both defense counsel and the Commonwealth on December 22, 2006.

As previously indicated the trial court denied the suppression motion on January 31, 2007. On February 5, 2007 the Court granted the Luzerne County Public Defender's Office Motion to Withdraw as counsel and Attorneys Menn, Corcoran and Kelly were appointed to represent the defendant.

Waiver of Trial by Jury

On February 22 2007, during a pre-trial conference for which defendant was present the record reflects:

1) Defense intended on proceeding with a bench trial;

2) Defendant signed a Waiver of Jury and speedy trial;

3) Trial was set for May 14, 2007;

On February 22, 2007 the Defendant and his trial counsel executed a Rule 600 with the trial being moved to June 30, 2007. At a pre-trial conference held on April 23, 2007, trial was again rescheduled for May 14, 2007.

Fink testified that he subsequently sent trial counsel a letter dated April 2, 2007 where he purportedly changed his mind about not having a trial by jury and produced a letter, introduced as Petitioner's Exhibit 1, (PCRA transcript p. 11). Another such letter, dated May 3, 2007, was produced in which Defendant Fink

11

indicated "you didn't get back to me about a jury trial." (Petitioner's Exhibit 2, PCRA Hearing Transcript pgs. 21-22), Fink additionally asserted his innocence to trial counsel.

On May 14, 2007, the defendant signed a second Waiver of Jury Trial. Also included in the trial record is the defendant's Information Sheet completed and executed by Fink in his handwriting. The last trial document includes a listing of the charges and the maximum sentence and fine per charge.

At the time of the trial, the Judge specifically questioned the Defendant:

THE COURT: Can I have everybody approach the bench? We'll go through the colloquy and the waiver.

..............

THE COURT: Mr. Fink, you're here and you're represented by Stephen?

MR. MENN: Yes. Basically, I was put on as lead counsel because it was a death penalty case at one point in time.

THE COURT: Are you currently under the influence of any drugs or alcohol?

THE DEFENDANT: No.

THE COURT: Are you suffering from any type of mental illness?

THE DEFENDANT: No.

THE COURT: What I want to make sure is that you're here today, this is a non-jury trial, that you fully understand you're waiving your right to trial by jury or non-jury trial today?

THE DEFENDANT: Yes.

12

THE COURT: Now, there was a questionnaire that was given to me. Can you read, write and understand the English language?

THE DEFENDANT: Yes.

THE COURT: Did you read this questionnaire?

THE DEFENDANT: Yes.

THE COURT: Is this in your handwriting, these answers?

THE DEFENDANT: Yes.

THE COURT: So every answer that I looked at before I came on the bench that is a question and an answer you wrote in?

THE DEFENDANT: He wrote it.

MR. MINN: I wrote it simply because he was handcuffed at the time. I went through each question with him. He gave me the answer and then I wrote the answer in. That is his initials on the bottom of every page and that is his signature where it's indicated Defendant.

THE COURT: And do you understand the main thing between a trial by jury and non-jury trial is there would be 12 jurors sitting up in the box that you and your counsel along with the District Attorneys would pick those jurors, and the evidence that would have to be presented to those jurors would be guilt beyond a reasonable doubt on the witnesses that are going to testify?

If the jury goes back to deliberate and they're unable to agree after the unanimous verdict, it's what we call a hung jury and the Commonwealth can decide to re-try you. At a later point in time on a hung jury, either they would find you guilty or not guilty.

In a trial by a judge, I'm the only one who's here and the Commonwealth has to convince me beyond a reasonable doubt of your guilt. So it's very highly unlikely I will not make a decision, so there would not be a hung jury trial. Do you understand that?

13

THE DEFENDANT: Yes.

THE COURT: Did anybody force or threaten you to do this?

THE DEFENDANT: No.

THE COURT: Did anybody promise you anything for doing this?

THE DEFENDANT: No.

THE COURT: Again, you fully understand here today this is a knowing and intelligent waiver of your right to a trial by jury?

THE DEFENDANT: Yes.

THE COURT: And you understand you have a right to participate in selecting a jury?

THE DEFENDANT: Yes.

THE COURT: And, again, the questions, just for my own benefit, the questions that are written here and the responses that your attorney filled in, you understood every one?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with the advice of your counsel?

THE DEFENDANT: Yes, I am.

THE COURT: And counsel went over with you the false imprisonment, maximum sentence 2 years, $5,000 fine. The second count was criminal trespass, I believe, 2 years maximum, $5,000 fine, and then criminal homicide, third degree, 20 years, $25,000. Criminal homicide, first degree, life. Commonwealth any objection to this?

MR. FINNEGAN: No, Your Honor. We've signed the waiver and we agree.

14

THE COURT: Thank you. Defense, any objection to this or any reason why your client should not be allowed to waive his right to a trial by jury?

MR. MENN: No, Your Honor, we believe it's in his best interest at this time.

THE COURT: The Court after reviewing the written colloquy provided to me in chambers and going through this oral colloquy feels that the Defendant is making a knowing and intelligent waiver for a trial by jury and the Court will proceed with a non-jury trial.   (See: Trial Transcript, pgs. 4-8)

The above establishes Fink's executed waiver was extensively reviewed by and with the trial judge.  Fink had every opportunity to request a jury trial and, simply stated, chose not to do so. Indeed, he requested, and knowingly and voluntarily to have his case determined by a judge.

During the PCRA hearing Fink indicated he thought he "had to go through with it that way," (See: PCRA Hearing Transcript pgs. 35 -36), because he thought he had to.

It is clear from the review of the record that trial counsel was appointed to represent Fink on February 5, 2007.  In their Motion to Withdraw, the Luzerne County Public Defender represented Fink waived trial by jury and the Commonwealth agreed to not seek the death penalty.

Trial counsel, Stephen Menn, testified that the reason for moving from a jury to a non-jury trial was to take "death" off the table. The Commonwealth agreed to not seek the death penalty in exchange for a non-jury trial. (See: PCRA Hearing Transcript July 22, 2011, pg 42.)

It is obvious there was a significant and discrete reason for Fink to agree to a not guilty waiver. The quid pro quo was the Commonwealth's agreement not to

15

pursue the death penalty. Fink received the benefit of his bargain and will not presently be heard to complain.

### Failure to Adequately Advise Defendant Regarding His Right to Remain Silent

A further matter raised by Fink is the appellate counsel's ineffectiveness for not raising on appeal the trial counsel's ineffectiveness in advising the Defendant not to testify in his own behalf that rendered the decision not to testify not knowingly and intelligently made as well as the trial counsel's own ineffectiveness in that regard.

During trial at the conclusion of day two, Judge Conahan indicated:

> THE COURT:   ...........What I'd like to do is clear the courtroom if everybody wouldn't mind just so the defense counsel is here with their client for the next ten minutes.
>
> (Whereupon, a recess was taken at 10:35 a.m. and resumed at 10:55 a.m.)
>
> THE COURT:   Attorney Corcoran, do you want to call your next witness?
>
> MR. MENN:   Your Honor, at this time the Defense will rest. We have no more witnesses to offer. We spoke with Mr. Fink and he has chosen not to testify in this case and we felt it's in his best interest.
>
> THE COURT:   You have reviewed with him the right to testify if he chooses to?
>
> MR. MENN:   Yes, we have.
>
> THE COURT:   He does not have to testify.   It's his constitutional right and he's invoking that right and the fact that he cannot be used as an inference against him in trial nor will the Court consider that as an inference in this case.   Did you review that with him?
>
> MR. MENN: Yes, Your Honor.

16

(See: Trial Transcript, pgs. 233-234).

It is clear that at a minimum, during trial twenty minutes were spent discussing the issue of whether Fink should testify.

Further Attorney Menn testified that he [would have] informed Mr. Fink he had a right to take the stand and testify but "we didn't think it was in his best interest to testify. We were all pretty much on board that the fact of the matter is that he had already pretty much testified by his statements; and, that at the time of him blacking out and going forward, there was nothing for him to testify about. Obviously, he blacked out."

Trial Counsel did not believe any further information could have been offered by Fink's testimony which would have been helpful, especially given the defense strategy. (See: PCRA Hearing Transcript July 22, 2014 pgs. 60-61) In fact, the worry was that further testimony could have undermined his case. (See: PCRA Hearing Transcript July 22, 2014 pg. 47). As indicated, the trial judge indicated that invoking his right to remain silent would not be held against him.

<u>Failure to Adequately Prepare for Trial</u>

Both Fink and trial counsel agree they discussed the need to be prepared for trial. Fink testified he was asked to sign a waiver because trial counsel needed more time to prepare and, although he initially objected, he ultimately agreed. Fink testified he agreed so trial counsel would have more time to review discovery and trial would be rescheduled in March, 2007.

Trial counsel, Stephen Menn, also testified he was assigned to Fink's case following the withdrawal by the Public Defender's Office because he was one of the

17

few conflict counsel who was certified in death penalty cases. Trial counsel agreed with Fink that additional preparation time was required to review discovery, speak with previous counsel, meet with Dr. Fischbein, and with Mr. Fink.

The record supports the conclusion that trial strategy was definitely affected by the Court's decision denying the suppression motion. Pa. R. Crim. P. 581(J) And permitting the admission of both the oral and written statements made by Fink into evidence. These statements established the following:

1)      Fink was inside decedent's home;

2)      Fink overheard a phone call between the decedent and her boyfriend;

3)      the conversation moved Fink because of the similarity of statements made by the decedent to her present boyfriend and those statements made by the decedent previously to Fink during their relationship;

4)      Fink grabbed decedent from behind;

5)      Fink proceeded to duct tape decedent's hands in front of her;

6)      Fink cut himself with a pocket knife;

7)      Fink and the decedent had a cigarette;

8)      Fink and decedent proceeded into the bedroom to participate in a sexual encounter;

9)      The decedent belittled Fink because of his inability to perform and Fink snapped;

18

Circulated 08/05/2015 01:43 PM

10) )NA testing demonstrated Fink's blood on the duct tape (See: Trial Transcript 142 143, 169, 179, 185, 187, 189-190 and Exhibit # 3 from the suppression hearing)

In addition to the above, defense counsel faced additional obstacles. Witness Debra Lechleitner testified that she dropped Fink off the evening of January 21, 2006 in the area of the decedent's home. The testimony of fact witnesses Rebecca Thompson, Sharon Steeber, Margaret Dorris, Danielle Campbell and Dawn Gardner all recounted threats made by Fink in the months preceding the homicide that he, Fink, knew "she was running around", "that he would make her pay, and that he was going to kill Charlene and himself with a syringe. (See: Trial Transcript pgs. 15-19, 28-29, 44-49, 54, 71-73, 75, 83-88, 92, 97-99, 102-110)

Based on these adverse facts trial counsel testified their strategy would be that when Fink blacked out, he "couldn't have had the proper mens rea for first degree murder and that it would be reduced to a lesser offense (See: PCRA Hearing Transcript July 22, 2014 pg. 53) and they would hire an expert if possible to support that position.

The testimony of trial counsel established meeting with Fink, speaking to witnesses, reviewing he file and retaining Dr. Fischbein. Although no investigator was hired, Trial counsel's testimony reflected "we had no information from a party, a source, including Mr Fink, or any discovery that would have led us to believe there was a third party that may have entered the house after the fact". (See PCRA Hearing Transcript July 22, 2014 pg. 56)

19

Failing to Ret₂ in an Expert to Challenge the Time of Death and to Assert the Importance of the La₁ k of DNA Evidence of the Defendant on the Victim

Current couns el argues that trial counsel should have hired an expert to demonstrate that Fin ₖ's DNA collected at the crime scene was not everywhere i.e. pillow case, under fi₁.gernails as well as an expert to challenge the time of death. Both poses superficiₐl appeal but must be considered strategy employed by trial counsel following disc ussion with co-counsel and Fink.

A claim posse₂ ses arguable merit where trial counsel ignores available and admissible evidence ₁hat would establish a defense. The lack of Fink's DNA on a pillow, or under the decedent's fingernails, or hiring an expert to challenge the pathologist's time of c eath fall within this prong. [See: Commonwealth v. Hawkins, 894 A.2d 716 (Pa. 200 5); Commonwealth v. Legg, 669 A.2d 389 (Pa. Super 1995)].

The decision tc call witnesses, fact or expert, is part of trial strategy. Counsel has an obligation to develop mitigating evidence but failure to do so does not constitute ineffective assistance [See: Commonwealth v. Bridges, 886 A.2d 1127 (Pa. 2005)].

To establish in ₂ffectiveness the petitioner must demonstrate the testimony would have been bene ficial. A different time of death or a lack of DNA is posited by PCRA counsel as evide nce of ineffectiveness since such evidence may have allowed Fink to develop an ali₁ i. However, trial counsel indicated "we had no one else there who could have cause₁l her death other than Mr. Fink; and, without, maybe, having another party who ma√ have been there or some other party who may have had a reason to want to kill the victim, we didn't think that the time of death was that

20

significant since it was provided in a time frame by the Prosecution which would have been consistent with Mr. Fink being there." (See: PCRA Hearing Transcript, pg. 58).

Given Defendant's argument, trial counsel is accorded broad discretion to determine tactics and strategy. We will not "armchair quarterback" trial counsel's decisions from hindsight but rather examine the strategy employed to advance the defendant's interest. See: Commonwealth v. Thomas, 744 A.2d 713 Pa. 2000); Strickland v. Washington, 466 U.S. 668 (1984); Commonwealth v. Speight, 677 A.2d 317 (Pa. 1966)].

Trial counsel acknowledges seeking to avoid a first degree murder conviction. A strategy was employed to reduce the Defendant's culpability. Trial Counsel advanced this objective by initiating plea discussion with the Commonwealth to reduce the charge (See PCRA Hearing Transcript July 22, 2014 page 42) and consulting with Dr. Fischbein, a board certified psychiatrist, as to other possible avenues such as 'diminished capacity", "competency", "not guilty by reason of insanity' or ",guilty but mentally ill" .

Dr. Fischbein's evaluation of Fink took place on November 4, 2006, while Fink was being represented by the Luzerne County Public Defender's Office. Fink related to Dr. Fischbein what happened on January 21, 2007. During this interview, Fink told Dr. Fischbein the same facts he provided to trial counsel. In addition, Fink told Dr. Fischbein that after he "blacked out" "he woke up with his hands around her neck". Diagnostically speaking, Dr. Fischbein determined Mr. Fink suffered from major depression, recurrent, passive-aggressive personality disorder, with

21

histrionic and borderline features such as taking a knife, cutting his thumb, and threatening to kill himself. "His inability to perform sexually results in her belittling him, berating him, he snaps, she's dead". (See: Trial Transcript pgs. 203-217).

Dr. Fischbein's evaluation does not support a lack of capacity; not guilty by reason of insanity; or guilty but mentally ill. As a result the defense adopted "the diminished capacity" argument. Here Trial Counsel proceeds in asserting the argument that Fink was incapable of forming the specific intent to kill and hoped to reduce first degree murder to third degree. Dr. Fischbein testifies that Fink's intent was to kill himself and not the victim. (See: Trial Transcript pg. 217).

Although trial counsel did not explore an alibi defense, based upon the time of death, neither Fink or counsel demonstrated such a defense existed. Trial counsel did not believe that an alibi defense existed. There was no proof that the home had been robbed, that there were items of subsequence stolen, and no evidence of another intruder. "There's no evidence that anyone else was there" trial counsel advised. (See: PCRA Hearing Transcript pg. 45).

In terms of the DNA, trial counsel knew Fink's DNA was on the knife, duct tape and in the hallway, even if it wasn't on the pillow or under her fingernails. Fink is in the house, cuts himself, places the duct tape around her arms and has been on the bed, so the evidence was very strong he was there but there was no evidence whatsoever that anyone else was there and so "we did not go down that road". (See: PCRA Hearing Transcript, pg. 68).

We find the testimony of trial counsel credible strategy of diminished capacity supported by expert testimony was not so unreasonable that "no

22

competent lawyer would have followed it". Moreover, an alternative time of death or lack of DNA under the victim's fingernails or on her pillow did not offer a substantially greater chance for success [See: Commonwealth v. Howard, 749 A.2d 911 (Pa. Super 2000) Commonwealth v. Legg, 711 A.2d 430 (Pa. 1998)].

It is obvious that the decision to employ a diminished capacity defense admitted the act and is inconsistent with a claim of innocence. However, the PCRA Court does not find that this strategy meets the second prong of Pierce.

Trial counsel raised the decision to deny the suppression motion, thus preserving it, but Pa. R. Crim. P. 581(J) states that the court's determination "shall be final, conclusive and binding at trial except upon showing of evidence previously unavailable". [See: Pa. R. Crim. P 581(J)]. The statements of Fink were coming in at trial and that ruling's impact controls any analysis of Pierce's third page.

### Potential Bias of Judge Conahan

Present counsel asserts trial counsel was ineffective for allowing Judge Conahan to sit as trier of fact while the judge was the subject of an ongoing investigation which trial counsel knew or should have known.

The only testimony offered in this regard is from Attorney Menn when he indicates that "I would have been totally unaware of any investigation or any wrongdoing by Judge Conahan at the time of this trial"..." (See: PCRA Hearing Transcript, pg. 41). In fact, the Exhibit attached to Defendant Fink's PCRA petition regarding Trial Judge Conahan's corruption issue is a PA Law Weekly article dated August 3, 2009, over two years after his trial in May of 2007.

23

It is unclear how trial counsel could have known this information prior to trial. Further, there was no testimony at the second PCRA hearing as to what effect being aware of the Conahan investigation would have had on his trial and more particularly, a demonstration of prejudice, that is, the outcome of the trial would have been different.

## Prejudice

Assuming for the sake of argument that trial counsel was ineffective for pursuing a diminished capacity defense, as well as all the issues raised by present counsel, is there a reasonable probability the outcome would have been different? The answer is unequivocally no.

Once Fink's statement is in evidence, of what value is an alibi defense, or the lack or location of DNA?

The testimony of Steeber, Leichleitner, Thompson, Dorris, Campbell and Gardner provided overwhelming circumstantial evidence of guilt which was not only consistent with the Defendant's statement but provided evidence of motive and intent. Fink's DNA was on the duct tape, and the glue from the duct tape was on the victim. There was no evidence to support another intruder, and Fink's own statement that he snapped, blacked out, and awakened with his hands around her neck were damning. Ms DeWitt was subsequently found dead.

Hugh Taylor had by oral motion requested a bifurcation of the instant PCRA hearing so he could try to find expert testimony regarding time of death and lack of DNA evidence on Fink's victim but once Fink's statement was in evidence an expert

24

DNA evidence on Fink s victim but once Fink's statement was in evidence an expert could not overcome th : other overwhelming evidence, so this request is Denied as it would not change the result.

This Court finds that neither the performance nor prejudice prongs of Pierce, have been established and therefore the ineffectiveness claims against appellate counsel is also Denied.

(Order entered separately on page 26)

25