J-A23009-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICHOLAS MARTIN | : | |
| | : | |
| Appellant | : | No. 1549 WDA 2018 |

Appeal from the PCRA Order Entered, October 5, 2018,
in the Court of Common Pleas of Elk County,
Criminal Division at No(s):  CP-24-CR-0000140-2013.

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:               FILED DECEMBER 06, 2019

Nicholas Martin appeals from the order denying his first petition for relief pursuant to the Post Conviction Relief Act ("PCRA").  42 Pa.C.S.A. §§ 9541-9546.  We affirm.

A jury convicted Martin of first-degree murder and abuse of a corpse resulting from the killing of his girlfriend.  This Court previously summarized the pertinent facts and procedural history of this case as follows:

> Three days prior to the murder, [Martin] hit [the victim] on the side of the face with her cell phone, spit on her, and said, "Next fucking time I see you, I'll kill you.  In the early morning hours of March 23, 2013, [Martin] stabbed [the victim] one hundred and twelve times in his apartment.  After initially stabbing [the victim] with a screwdriver, [Martin] stopped, went to the kitchen to get a knife, and continued to stab [the victim] until she was dead.  He disposed of [the victim's] body in a steep wooded area known as Sandy Beach.  After the murder, [Martin] texted [the victim's] mother, using [the victim's] phone, to conceal

> the murder. [Martin] was ultimately arrested and charged with, inter alia, criminal homicide. At trial, [Martin] did not deny the killing, but claimed he acted under the heat of passion or was voluntarily intoxicated. Both the Commonwealth and [Martin] called expert witnesses to opine on [Martin's] mental state at the time of the killing.

Commonwealth v. Martin, 153 A.3d 1122 (Pa. Super. 2016), unpublished memorandum at 1-2.

As noted above, the jury found Martin guilty of first-degree murder and abuse of a corpse. On June 11, 2015, the trial court sentenced Martin to a term of life in prison for his murder conviction and a concurrent term of one to two years of imprisonment for his abuse of corpse conviction. Martin filed a timely appeal to this Court, and we affirmed. Martin, supra. Our Supreme Court denied his petition for allowance of appeal on November 29, 2016. Commonwealth v. Martin, 162 A.3d 1116 (Pa. 2016).

Martin filed a timely, counseled PCRA on December 4, 2017. The PCRA court held an evidentiary hearing on May 23, 2018. Martin's trial counsel and Martin testified.[1] By order entered October 5, 2018, the PCRA court denied Martin's PCRA petition. This appeal followed. Both Martin and the PCRA court have complied with Pa.R.A.P. 1925.

Martin raises the following issues on appeal:

_____

[1] Two attorneys represented Martin at trial. Because of Martin's claims focus on the effectiveness of only one of them, we refer to this attorney as trial counsel.

1. At this homicide trial, the defense sought a voluntary manslaughter verdict. During Trial Counsel's closing argument, however, he mistakenly conceded that malice was present – thus undermining his voluntary manslaughter argument. Is [Martin] entitled to PCRA relief because he was prejudiced by trial counsel's ineffective assistance?

2. The Commonwealth requested an improper modification of the standard jury instruction covering voluntary manslaughter. Trial counsel failed to effectively respond to that request; as such, the trial court granted it. Given that the modification undermined the defense's ability to argue for voluntary manslaughter, was [Martin] prejudiced by Trial Counsel's ineffective assistance?

3. Trial Counsel's use of expert testimony was ineffective. As a result, Trial Counsel offered testimony that undermined [Martin's] defense. Was [Martin], again, prejudiced by Trial Counsel's ineffective assistance?

Martin's Brief at 3 (footnote omitted).

Our scope and standard of review is well settled:

In PCRA appeals, our scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. Because most PCRA appeals involve questions of fact and law, we employ a mixed standard of review. We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions de novo.

Commonwealth v. Reyes-Rodriguez, 111 A.3d 775, 779 (Pa. Super. 2015) (citations omitted).

All three of Martin's issues allege the ineffective assistance of trial counsel. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish, by a preponderance of the

evidence, that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." Id. This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) counsel's act or omission prejudiced the petitioner. Id. at 533.

As to the first prong, "[a] claim has arguable merit where the factual averments, if accurate, could establish cause for relief." Commonwealth v. Stewart, 84 A.3d 701, 707 (Pa. Super. 2013) (en banc). "Whether the facts rise to the level of arguable merit is a legal determination.'" Id. (citing Commonwealth v. Saranchak, 866 A.2d 292, 304 n.14 (Pa. 2005).

As to the second prong of this test, trial counsel's strategic decisions cannot be the subject of a finding of ineffectiveness if the decision to follow a particular course of action was reasonably based and was not the result of sloth or ignorance of available alternatives. Commonwealth v. Collins, 545 A.2d 882, 886 (Pa. 1988). Counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." Commonwealth v. Ervin, 766 A.2d 859, 862-63 (Pa. Super. 2000) (citation omitted). A petitioner asserting ineffectiveness based upon trial strategy must demonstrate that the "alternatives not chosen offered a potential for success substantially greater

- 4 -

than the tactics utilized." Commonwealth v. Clark, 626 A.2d 154, 157 (Pa. 1993). "We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he [or she] may have taken." Stewart, 84 A.3d at 707. A PCRA petitioner is not entitled to post-conviction relief simply because a chosen strategy was unsuccessful. Commonwealth v. Buksa, 655 A.2d 576, 582 (Pa. Super. 1995).

As to the third prong of the test for ineffectiveness, "[p]rejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Stewart, 84 A.3d at 707. "A reasonable probability 'is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Commonwealth v. Rathfon, 899 A.2d 365, 370 (Pa. Super. 2006).

Finally, when considering an ineffective assistance of counsel claim, the PCRA court "is not required to analyze these [prongs] in any particular order of priority; instead if a claim fails under any necessary [prong] of the ineffectiveness test, the court may proceed to that [prong] first." Commonwealth v. Tharp, 101 A.3d 736, 747 (Pa. 2014) (citations omitted). For example, when it is clear that the petitioner has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. Commonwealth v. Travaglia, 661 A.2d 352, 357 (Pa. 1995).

In order to address properly Martin's three ineffectiveness claims, we discuss in detail the relevant evidence presented by both the Commonwealth and the defense.

Commonwealth's Evidence

As its first witness, the Commonwealth called Jessie Pino, a childhood friend of the victim. The victim had introduced him to Martin. Pino testified to the interactions he had with Martin immediately before and after the incident in question.

Pino first testified that, on the evening of March 22, 2013, Martin picked him up at his apartment around 8:00 or 9:00 p.m., and the two went to Martin's apartment. Once there, they drank heavily and finished a bottle of cognac. Pino testified that at approximately, 2:00 a.m. Martin took him to get something to eat, and then dropped him off at his apartment.

Pino's second interaction with Martin occurred the next day at around 1:00 p.m. when Martin came back to his house. Pino testified that he assumed it was his mother's boyfriend, but when he returned to his bedroom, he saw Martin sitting on his bed. When asked what happened next. Pino testified:

> A. [When I saw Martin] I was little surprised because I didn't plan on seeing him there. He looked very uneasy. I'd say he was somewhat crying but not to where, you know, you could obviously tell, but he looked upset And he had told me that he had done something. He said, I did it.
>
> I said, Did what?
>
> He said, I killed her.
>
> I said, Killed who?

He said, I killed [the victim].

(Interruption).

THE WITNESS: He had told me that he had killed somebody. And I asked him who, and he had said [the victim]. And I didn't believe him at first. And he told me that, when he dropped me off late that morning, that he went back to his apartment, but [the victim] needed picked up in St. Marys.

And he said on the way there he kept telling himself that he should just turn back, turn back, but he ended up picking her up in St. Marys and driving back to his apartment in Johnsonburg. And he said, when they got back to their apartment he just wanted to go to bed. He didn't want to do anything. He just wanted to go to sleep and not talk about nothing.

He told me they ended up having sex when they laid down. And while they were having sex, he said he choked her and that she said, Let go. He let go. And he said the second time he choked her, they fell off the bed. And he said he choked her to where he thought she was dead. He said when he let go, she jumped up and ran.

\* \* \*

He said that she got up and ran toward the door, and he tackle her down and stabbed her with a screwdriver three times.

\* \* \*

He said, after he had stabbed her with the screwdriver, he had went into the kitchen to get a knife, and he came back and he - - I asked him how many times he had stabbed her. He said at least a hundred times.

N.T., 3/25/15, at 64-66.

The Commonwealth asked Pino what happened next, and the following exchange took place:

A. I asked him if she was dead, and he said yeah. And I said, How? And he said that he smacked her on the butt and he poked her with the knife again.

Q. Did he ever tell you anything about her hands?

A. He said that she was holding a wound on her neck with her hand, and he had [taken] the kitchen knife and put it through her hand into her neck and twisted it. And he had also stated that he never knew it was so easy for a knife to go into a person like that.

N.T., 3/25/15, at 66-67.

Pino then testified about how Martin told him he disposed of the victim's body. According to Pino, Martin told him how he wrapped the victim in a blanket, carried her down to her vehicle, and drove to Sandy Beach. Once there, he "put her body in a swampy area next to a few deer carcasses, and had lightly buried her underneath snow because the ground was too hard to dig." N.T., 3/25/15, at 69.

Pino then testified that, after being Martin told him these details, Steve Mercer and his girlfriend came over. Pino and Mercer had planned to have a party that night at Mercer's apartment. After about fifteen to twenty minutes, Martin said he had "to take care of some things," and left. N.T., 3/25/15, at 7. Pino then told Mercer that Martin had killed someone.

Pino's third interaction with Martin occurred later that day when Martin showed up at Mercer's apartment and wanted to party. However, because Mercer had told Pino that he did not want Martin at the party, Pino persuaded Martin to go with him to Pino's apartment. Eventually, Martin fell asleep on the couch. The next day, Martin left about 3:00 p.m.

Pino further testified that as he was straightening up the room, he heard a phone ringing and discovered the victim's cell phone in his couch cushions. Pino did not answer the phone. He then called Martin and told him he had left his phone at this apartment. According to Pino, Martin told him "not to use the phone, to not touch it, don't call nobody" and he would "come pick it up right away." N.T., 3/25/15, at 79. Martin arrived shortly thereafter and took the phone.

Pino later called the state police and gave them the information about Martin, and he took the body.

The Commonwealth called another witness whom Martin told about the incident. Ronald Beltowski testified that he had occasion to speak with Martin in April and May of 2013.[2] According to Beltowski:

> A. . . . He proceeded to tell me that he took her back to his apartment to where he would have sex with [the victim]. While he was done having sex with [the victim], he grabbed her by the throat and started choking her, threw her on the floor and started to - - stabbing her repeatedly with a Phillips screwdriver. The last stab he made he took her hand to her neck and stabbed it through her hand to her neck. He then proceeded to tell me that he went and got a shower because he thought [the victim] was just playing dead. Once he got out of the shower and realized she really was dead, he wrapped her up in sheets and carried her down the steps, down to the hallway steps to his vehicle where he put her in the back of his vehicle.

---

[2] Martin talked to Beltowski while they were both housed in the Jefferson County prison. This information did not become known until Martin testified in his own defense. See N.T., 3/27/15, at 59.

N.T., 3/25/15, at 221-22.

According to Beltowski, Martin told him about how he disposed of the victim's body and his attempt to clean the crime scene. Additionally, Martin told him that, after the victim's death, he used her cell phone to text people, including the victim's mother, "pretending to be her." Id. at 223. Beltowski stated he did not know Pino and had never spoken to him about the incident.

The Commonwealth called the victim's mother, Susan Trumbull, who testified that the police told her that her daughter had been dead since Saturday, March 23, 2013, even though she received text messages from her daughter's phone after that date. Ms. Trumbull also provided details about an incident that occurred at the local Sheetz three days prior to her daughter's murder. While her daughter was at the gas pumps, she saw Martin approach car: "He was at - - had her phone in his hand. He was reading all [her] texts, calling her filthy names." N.T., 3/26/15, at 45. According to Ms. Trumbull, Martin then stated he was going to break the phone. The following exchange then occurred:

> Q. What did you do?
>
> A. I told him, I said, Don't bust that phone. That phone is mine. And you need to leave.
>
> Q. Did he leave?
>
> A. No.
>
> Q. What happened next?
>
> A. She finished pumping gas. She kind of looked at me and said, You can drive. She went over and got in the passenger side of my car and was sitting there, and he got [near] my

driver's side where I couldn't get in and leaned in, took her phone, threw it at her and said, Next fucking time I see you, I'll kill you.

Q. How long was that before you daughter's murder?

A. Three days.

Id. The Commonwealth then played a video of the incident as recorded by Sheetz's security cameras.

As its final witness, the Commonwealth recalled Pino. Pino was asked about a Facebook post and Facebook messages that he and the victim exchanged on the night him and Martin were drinking. In these messages, the victim stated that Martin threatened to kill her and that she had just had sex with someone else that night. See N.T., 3/26/15, at 107-08. Pino testified that he showed the text to Martin, and described Martin's reaction as follows:

A. Didn't swear, didn't snap. He didn't insult her, disrespect her. Well, he did say she was lying. He didn't believe it. He just acknowledged it and said, But she's lying anyway, almost like he blew it off.

Id. at 109.

### Defense Evidence

Martin took the stand on his own behalf. According to Martin, in late October or early November of 2012, he learned that the victim was pregnant. When asked whether he agreed to having a child with the victim, Martin responded: "Yeah, I mean, I loved her. . . . In my mind, somebody that I love is about to have a kid with me." N.T., 3/27/15, at 12. Martin testified

that they intended to live as a family in the apartment he rented where the incident took place. Martin identified a calendar from the apartment on which the victim had marked June 12, 2013, as the due date for "Kiona Jo," the child they were expecting.

According to Martin, around the end of February the victim told him she was no longer pregnant and that she had lost the baby at the end of December 2012. This revelation caused the couple's relationship to worsen.

Trial counsel next asked Martin about the incident. Martin testified that on that night, in addition to drinking with Pino, he had taken six Vicodin 10. He took three with Pino and three before he went to pick up the victim. Id. at 17. Martin described these pills as painkillers, and stated that he bought them from a friend. Martin also acknowledged Pino's testimony regarding drinking the cognac, but testified they also drank a whole bottle of vodka. Id. at 20. Trial counsel then asked Martin about the Facebook messages Pino had testified about receiving during that time, and Martin testified that he was "very much" bothered about the fact that the victim stated she had just had sex with another man, but told Pino that she was lying. Id. at 29. Martin then described dropping Pino off and then going to pick up the victim.

According to Martin, when they returned to the apartment, they were drinking, talking about their relationship, and eventually had sex. According to Martin, the victim then told her she had cheated on him, and Martin became upset. Martin testified that he got up and told her she had to leave. He then grabbed her purse, and a syringe fell out of it. Martin testified that seeing the

syringe got him more upset, because one of the biggest things they fought about was her using drugs. Id. at 43. Martin then testified that the couple argued and Martin told her "if it wasn't for you always getting high, maybe we wouldn't have lost the baby." Id. at 45. In response, the victim:

> . . . stepped a little forward and said, F you Nick Martin, and you shouldn't care so much about Kiona. She wasn't yours anyway.

Id. at 46.

Martin testified that these statements infuriated him and he grabbed her by the neck, "and then everything just kind of shuttered." Id. at 47. According to Martin, the next thing he recalled was kneeling on top of the victim who was motionless and bleeding on the floor. Finally, Martin acknowledged the testimony from the Commonwealth regarding how he disposed of the victim's body.

Given this factual background, we now consider each of Martin's ineffectiveness claims in the order in which he raised them.

In his first issue, Martin alleges that trial counsel "mistakenly conceded malice was present," and that this mistake undermined his argument for voluntary manslaughter. Martin's Brief at 9. According to Martin, "trial counsel's concession of malice was not the result of any strategic choice. On the contrary, the concession was simply a mistake that evidently stemmed

from [trial counsel's] tenuous grasp of homicide law." Martin's Brief at 31.[3] Martin asserts that he was prejudiced by trial counsel's concession because it "rendered a manslaughter verdict impossible." Id. at 47.

We first acknowledge the differences between the crimes of murder and voluntary manslaughter. As our Supreme Court has summarized:

> [A] defendant charged with murder may establish that he is guilty, not of murder, but rather voluntary manslaughter, by proving that, at the time of the killing, he was acting under a sudden and intense passion resulting from serious provocation by the victim.

Commonwealth v. Busanet, 54 A.3d 35, 55 (Pa. 2012). The distinguishing factor between these two crimes concerns intent. Murder involves "malice," while the "heat of passion" voluntary manslaughter involves the absence of malice. See generally, Commonwealth v. Carter, 393 A.2d 13 (Pa. 1978).

In his opening to the jury, Martin's trial counsel stated that the defense did not dispute that Martin killed the victim. Trial counsel then noted that the Commonwealth charged Martin with the general crime of criminal homicide, and explained the various degrees of homicide to the jury, including first-degree and third-degree murder, and voluntary manslaughter. As to third-degree murder, trial counsel stated:

_____

[3] Martin further argues that, "[m]aking matters worse, [trial counsel] bolstered the concession by improperly couching it as his own personal opinion." Martin's Brief at 31. Because Martin did not raise this claim in his Rule 1925(b) statement, it is waived. See generally, Commonwealth v. Pukowsky, 147 A.3d 1229 (Pa. Super. 2016).

We also – you're going to also have to decide to consider a charge of third-degree murder. Third-degree murder is defined as any killing with malice - - there's that word again - - that is not first-degree murder. Okay? So third-degree murder has malice, but it - - but there is no specific intent to kill, which is what I just told you. The premeditated, deliberate, willful, fully formed intent[,] conscious of that intent.

So if you conclude that there was malice but no specific intent to kill, then you can come back with a guilty verdict for third-degree murder. I'm not even going to talk about malice. It's a difficult concept. [The trial court] will tell you what malice is. But I think I can tell you in this case there is malice, okay. So I - - that will help because malice is a difficult concept to wrap your head around. And I think in this case I don't have any problem telling you that, although I think you will find that there was no specific intent to kill, I think there was malice.

N.T., 3/30/15, at 25 (emphasis added).

Trial counsel then attempted to "take back" his admission of malice when discussing voluntary manslaughter:

The third charge that you're going to have to consider, other than abuse of corpse, is voluntary manslaughter. Voluntary manslaughter is different in that there is no malice, and there's a special reason there's no malice. It's the heat of passion situation. So when I told you there was malice, I'm taking that back a little bit. I'm - - because in a - - in the heat of passion situation that takes away the malice. So when you're considering first and third-degree murder, you can say there was malice, which I just told you, but you have to - - when you look at the voluntary manslaughter charge, that's where you have to decide whether there is malice, and that is where [the trial court's] instruction will come in.

* * *

So with voluntary manslaughter, there is no malice if [Martin] was acting under a heat of passion because of a serious provocation. Okay? And I talked to you in the

beginning about what heat of passion is. It's - - you have a serious provocation followed by a sudden and intense passion that renders you incapable of cool reflection at what you are doing. Okay.

When you have that, that eliminates the malice and that eliminates either type of murder, either first degree or third degree.

N.T., 3/30/15, at 25-26 (emphasis added).

The PCRA court found that this ineffectiveness claim did not warrant post-conviction relief. The court explained:

The Court finds that counsel's concession of malice had a reasonable basis as the alternative did not offer a potential for success substantially greater than the concession. The evidence adduced at trial was sufficient to establish malice and so the alternative would not have had a potential for success substantially greater than the concession.

PCRA Court Opinion, 10/5/18, at 3.

Our review of the record supports the PCRA court's conclusion that Martin has failed to establish trial counsel's concession of malice amounted to ineffectiveness. In essence, the PCRA determined that, given evidence presented by the Commonwealth supporting a finding of a specific intent to kill, had trial counsel not conceded malice, Martin's guilty verdict would not have been different. We agree. Even if trial counsel's concession of malice was an error or had no reasonable strategic basis, it is clear that Martin cannot establish prejudice. Given the testimony presented by the Commonwealth— including the graphic details Martin told both Pino and Beltowski—the evidence

of malice was so overwhelming that there is no reasonable probability that the verdict would have been different. Thus, Martin's first issue fails.

In his second issue, Martin asserts that trial counsel failed to respond effectively to the Commonwealth's request to modify the standard jury instruction for the crime of voluntary manslaughter. According to Martin:

> That modification, however, misstated—indeed, distorted—the law on voluntary manslaughter. Critically, Trial Counsel filed to properly object to the modification. [Martin] suffered prejudice as a result. This is so because the improper modification undermined the defense's best chance for a lesser degree of homicide verdict.

Martin's Brief at 32.

To decide this issue, we first review the standards we employ when reviewing jury instructions:

> When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

Commonwealth v. Roane, 142 A.3d 79, 95 (Pa. Super. 2016) (citation omitted).

Martin's claim involves our Supreme Court's decision in Commonwealth v. Berry, 336 A.2d 262 (Pa. 1975). In Berry, our Supreme Court concluded the trial court's voluntary manslaughter was inaccurate

because it "suggested that the provocation must necessarily occur in the presence of the accused before it could be considered legal and sufficient provocation." Id. The Court then went on to explain:

> While words of an insulting and scandalous nature are not sufficient cause of provocation, [Commonwealth v. Drum, 58 Pa. 9, 14, 17 (1868)], words conveying information of a fact which constitutes adequate provocation when that fact is observed would constitute sufficient provocation. LaFave and Scott, Criminal Law 576-577 (1972); Perkins, Criminal Law 62 (1969). The threatened or immediate infliction of serious bodily injury upon a parent, spouse or child because of the relationship of the parties and the expected concern of one for the well being of the other, has occasioned courts to hold this conduct may be sufficient provocation to reduce the killing to voluntary manslaughter. See Commonwealth v. Pease, [69 A. 891, 892 (Pa. 1908)].

Id. at 264-65.

Here, based on Martin's testimony that he became enraged once the victim said "F you Nick Martin, and you shouldn't care so much about Kiona. She wasn't yours anyway," see supra, the Commonwealth requested that the trial court, when instructing the jury as to the crime of voluntary manslaughter, include the language from Berry that "insulting and scandalous words are not enough to incite passion." N.T., 3/30/15, at 11. Trial counsel then stated, "I would object to anything other than the standard jury instruction but - - I'm sure we could pick single phrases out of a lot of cases that would go both ways." Id. at 12. The trial court granted the Commonwealth's request, effectively overruling trial counsel's objection. As part of the jury charge, the trial court instructed:

This is the instruction for voluntary manslaughter where murder is an issue. As my earlier definition of malice indicates, there can be no malice when certain reducing circumstances are present. When those circumstances are present, a killing may be voluntary manslaughter but never murder. This is true when a defendant kills in heat of passion following serious provocation. Accordingly, you can find malice and murder only if you are satisfied beyond a reasonable doubt that [Martin] was not acting under a sudden and intense passion resulting from serious provocation by [the victim].

A defendant acts under an intense passion if he acts under an emotion such as anger, rage, sudden resentment or terror that is so strong that it renders him incapable of cool reflection. A defendant acts under a sudden passion if the time between the provocation and the killing is not long enough for the passion of a reasonable person to cool.

A defendant's passion results from serious provocation if it results from the conduct or events that are sufficient to incite an intense passion in a reasonable person. Thus the existence of intense passion turns on the actual, mental and emotional state of the defendant while the existence of sudden passion and serious provocation turn on how a reasonable person confronted by the same provocation would react. Remember, you can find malice and murder only if you are satisfied beyond a reasonable doubt that [Martin] was not acting under a sudden and intense passion resulting from serious provocation by [the victim].

Insulting and scandalous statements are alone insufficient to demonstrate sudden passion. The law recognizes that the cumulative impact of the series of related events can lead to a sudden passion and amount to serious provocation. The test is whether a reasonable person, confronted with the same series of events, would become so impassioned that he or she would be incapable of cool reflection.

If you do not find that [Martin] had malice and committed murder, you may find him guilty of voluntary manslaughter as long as you are satisfied that the following three elements have been prove beyond a reasonable doubt: First, that

> [the victim] is dead; second, that [Martin] killed her; and third, that [Martin] had the intent to kill.

N.T., 3/30/15, at 92-94.

Martin now claims that that this reference to the language from Berry was incomplete because trial counsel should have insisted that the second clause from Berry, "words conveying information of a fact which constitutes adequate provocation when that fact is observed would constitute sufficient provocation," be "included in the instruction, or better yet, the court should have refused entirely to modify the standard instruction language." Martin's Brief at 36.

The PCRA court found the instructions given to be a proper statement of Pennsylvania law regarding voluntary manslaughter, and determined that Martin could not establish prejudice. The court explained:

> The Court finds that the instruction, [using] only the first part of the sentence from Berry, is not in itself improper. Further, the Court finds that counsel's failure to object to the instruction did not result in prejudice. A reasonable man would not become impassioned to the extent that his mind was incapable of cool reflection given the information of past infidelity of a girlfriend or even that a miscarried child was not his. If even such a revelation was found to be sufficient provocation there was ample evidence presented that [Martin] did not act in the heat of passion when he committed the homicide. The testimony of Dr. Wright along with testimony that [Martin] told the victim only three days prior to the homicide, "next fucking time I see you, I'll kill you", demonstrate that [Martin] did not act in the heat of passion. Therefore, there is not a reasonable probability that [] the outcome of the proceeding would have been different.

PCRA Court Opinion, 10/5/18, at 2.

Our review of the record supports the PCRA court's conclusion that Martin's second claim of trial counsel's ineffectiveness fails. When considering the charge on voluntary manslaughter as a whole, the trial court arguably provided a correct instruction regarding the elements of the crime. Even if, as Martin suggests, the instruction was incomplete, Martin would still not be able to establish prejudice. Once again, we note the jury found that Martin's words and actions sufficiently demonstrated a specific intent to kill. Thus, we agree with the PCRA court's conclusion that, given the other evidence produced by the Commonwealth that demonstrated a premeditated, specific intent to kill, Martin could not establish prejudice. In such circumstances, Martin cannot establish that had the precise language of Berry been included in the above instruction, his guilty verdict would have been different. Thus, Martin's second issue fails.

In his third and final issue, Martin asserts trial counsel's use of R. William Tallichet, a licensed psychologist, at trial to describe Martin's mental state at the time of the murder was ineffective for two reasons. Martin first claims that trial counsel failed to investigate Dr. Tallichet's background. Had he done so, trial counsel would have learned that Dr. Tallichet's license at one time had been suspended due to an improper intimate relationship with a client. According to Martin, the Commonwealth introduced this fact on cross-examination and emphasized it during its closing argument. According to Martin, "[h]ad Trial Counsel performed a Google of [Dr.] Tallichet here, they

could have avoided the disaster of putting him on the stand." Martin's Brief at 40.

The PCRA court found this claim to lack arguable merit, explaining that trial counsel had used Dr. Tallichet "as an expert witness without incident and his disciplinary issue did not necessarily affect his knowledge as an expert." PCRA Court Opinion, 1/5/18, at 3. We agree.

Our review of the record reveals that, while the Commonwealth immediately cross-examined Dr. Tallichet regarding his license suspension, Dr. Tallichet acknowledged that this disciplinary action occurred twenty years ago. See N.T., 3/27/15, at 157. Moreover, although the Commonwealth did mention the disciplinary action in its closing, it only briefly made reference to this fact, and challenged more aggressively Dr. Tallichet's expert findings and diagnoses, in light of the Commonwealth's expert testimony that Martin was able to form a specific intent to kill and inconsistencies in Martin's version of the killing during different stages of the investigation of the crime. See N.T., 3/30/15, at 58-74.[4]

As the second claim of ineffectiveness regarding the use of Dr. Tallichet's testimony, Martin claims that trial counsel failed to communicate adequately

_____

[4] In support of this portion of his ineffectiveness claim, Martin references two articles in which Dr. Tallichet's disciplinary issues had been introduced at trial. See Martin's Brief at 38-39. While these articles discuss the expert's past discipline, they do not suggest that counsel was found ineffective for presenting his expert testimony or that this disclosure resulted in post-conviction relief for a criminal defendant.

with him before trial. Martin contends that trial counsel should have communicated with Dr. Tallichet so that counsel could fully understand the expert's conclusions and diagnoses and thereby adjust his direct examination of Dr. Tallichet accordingly. Martin's Brief at 41-42. More specifically, Martin asserts that, although trial counsel, in his opening to the jury, stated that the defense would present a claim of voluntary intoxication, trial counsel subsequently abandoned the claim, given Dr. Tallichet's trial testimony. See N.T., 3/30/15, at 16. According to Martin, "[i]t's inexcusable that [trial counsel] failed to sufficiently discuss [Dr.] Tallichet's expected testimony before trial in order to ensure that he understood whether [Dr.] Tallichet's testimony would support a defense theory that [trial counsel] opened to the jury on." Martin's Brief at 42.

In order to address this issue properly we first recite trial counsel comments during his opening statement that Martin now challenges:

> The other thing that you may be asked to decide on at the end of this case is a charge of third-degree murder, and that may - - and I expect it will involve what's called voluntary intoxication. Okay. Voluntary intoxication in a homicide case can be a limited type of defense, and you're going to hear testimony about that. What that means is, if you are under the influence of alcohol or both to the point that you are unable to form the specific intent to kill, if that's the situation, that can reduce a first-degree murder charge down to a - - change first-degree murder to a third-degree murder charge. Okay.

N.T., 3/25/15, at 37. Trial counsel then informed the jury that, although he expected the evidence to support a lesser degree of criminal homicide, the

jury would have to base any guilty verdict on the evidence as it developed at trial. See id. at 38.

We next summarize the expert testimony presented by both parties. At trial, after discussing Martin's difficult childhood and adolescence, as well as his history of psychological diagnoses, Dr. Tallichet testified:

> The important factors, as I've mentioned, added to the situation or the circumstances that were very potent and very toxic and culminated in the death of [the victim]. The psychiatric problems that he's had that I mentioned, the difficulties that had been persistent and interfered with his thinking, planning, judgment, making decisions, and controlling his impulsivity, and taking those and combining them with the high level of alcohol, medication, and this produced a condition of voluntary intoxication. So he was overpowered by all of these factors at the time of the assault.
>
> What happened at that point I believe is that there was a loss of both cognitive thinking and volitional emotional control. This was what's termed a red-out or a blind rage for which, when I saw him, he has no memory for. And, again, the issues as - - and they escalated: Being cheated on, the syringe, and being told the baby is not yours. So what happens really was a very intense and sudden kind of passion, and there was no contemplation, nor reflection, and again, he was very much incapacitated at that point.

N.T., 3/2/15, at 151-52.

Trial counsel then asked Dr. Tallichet whether, "in the context of what happened," it was "possible to separate the alcohol use from all the other factors that you testified to that you believe provided this state of sudden and intense passion." Id. at 152. Dr. Tallichet responded:

> A. No. They all were occurring concomitantly. And it would be impossible really to say, well, it was just this

> or that. I think in total, in total the combination of the alcohol, Vicodin, their history, and his own history - - developmental history combined to produce the fatal result.

Id.

In rebuttal, the Commonwealth called its own expert, Dr. Bruce A. Wright, a licensed psychiatrist. According to Dr. Wright, when interviewing Martin he discovered, that Martin's responses to him differed from what he had told Dr. Tallichet, as well as others, at different stages of the investigation. This caused Dr. Wright to be concerned about "malingering," which is "an attempt at deceit . . . essentially faking something, in order to gain something." N.T., 3/27/15, at 207. Ultimately, Dr. Wright concluded that Martin "had the cognitive capacity to for the specific intent to kill and to be fully conscious of that intent. And, again, I base that in large part on what he told Mr. Pino but also his behavior prior to and after the incident. Id. at 219.[5]

As noted above, although trial counsel referenced the voluntary intoxication defense in his opening, he later decided not to seek a voluntary intoxication jury instruction. The PCRA court found that Martin did not establish prejudice:

_____

[5] As to one of these inconsistencies, Dr. Wright testified that Martin never told him about the victim's statement that the baby was not his. In sur-rebuttal, Martin took the stand and insisted that he did provide this information to Dr. Wright. In addition, the Commonwealth, recalled Trooper Patrick McMackin to testify about certain prison phone recordings of Martin stating "at one point, did [he] ever think this was self-defense" given the amount of time he stabbed the victim. N.T., 3/27/15, at 245.

> As to the issue of the testimony, there is no evidence that any expert could have testified to what defense counsel desired. While it may have been unhelpful to [Martin], the Court finds that it was not ineffective as an alternative would not have had a potential for success substantially greater[.]

PCRA Court Opinion, 10/5/18, at 3.

Our review of the record supports the PCRA court's conclusion that Martin has not established his claim of ineffectiveness. As noted by the PCRA court, Martin does not suggest that another expert could have provided testimony that would have been more beneficial. Rather, he avers that, had trial counsel not called Dr. Tallichet as a witness, the Commonwealth would have had no need to present Dr. Wright's damaging expert testimony. In essence, Martin suggests that trial counsel could have presented a heat of passion defense without the use of expert testimony.

As noted above, this Court does not employ a hindsight analysis when deciding a claim of ineffectiveness. Stewart, supra. Nor can a finding of ineffectiveness be based solely on the fact that counsel's chosen strategy was unsuccessful. Buksa, supra. Practically all of the information that Tallichet relied upon in presenting his expert testimony came from Martin himself.[6] In presenting its own expert, the Commonwealth presented evidence that Martin may have engaged in "malingering conduct" and possessed a specific intent to kill. See supra.

_____

[6] Dr. Tallichet did testify that he had telephone conversations with Martin's father and stepmother. See N.T., 3/27/15, at 128-29.

Moreover, the "red-out or blind-rage" suggested by Dr. Tallichet was contradicted by testimony from two Commonwealth witnesses who testified that Martin discussed details of the killing with them. See supra. Martin cannot contradict the fact that it was these inconsistencies, rather than the actual conclusions and diagnoses of Tallichet, that led to his first-degree murder conviction. Moreover, he cannot establish that presenting only his own testimony regarding the incident would have led the jury to convict him of voluntary manslaughter. In short, we cannot conclude that the jury verdict would likely have been different had trial counsel never broached the defense of voluntary intoxication in his opening to the jury. Thus, Martin's third issue fails.

In sum, because Martin has failed to establish his claims of trial counsel's ineffectiveness, we affirm the PCRA court's order denying him post-conviction relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/6/2019